[No. 30632. Department Two. December 7, 1948.]

BUFFELEN LUMBER AND MANUFACTURING COMPANY, *Respondent*, v. THE STATE OF WASHINGTON, *Appellant*.[1]

[1] Reported in 200 P. (2d) 509.

*The Attorney General, Max Kaminoff* and *William C. Klein, Assistants,* for appellant.

*McMicken, Rupp & Schweppe* and *A. V. Stoneman,* for respondent.

*W. E. Heidinger* and *Oliver Malm, amici curiae.*

SIMPSON, J.—The state of Washington appeals from a judgment of the superior court of Thurston county rendered in favor of the plaintiff.

For cause of action, plaintiff alleged in its complaint that a substance known as "hog fuel" is a waste product resulting from plaintiff's operations in producing plywood, doors, and other lumber products, and that plaintiff is not a manufacturer of "hog fuel"; that the state tax commission has claimed that plaintiff has consumed this fuel to the value of $37,500, and has collected a tax known as a manufacturer's or business and occupation tax of one quarter of

one per cent, and a compensating tax of three per cent; further, that the collection of these taxes is without warrant in law.

The answer of the state denies that "hog fuel" produced by plaintiff is a waste product, but asserts that plaintiff is a manufacturer thereof.

The appellant's assignments of error challenge the findings of fact that respondent was not a manufacturer of hog fuel, and that, as to the hog fuel, respondent was not using an article produced for commercial use.

The respondent is primarily engaged in the business of manufacturing plywood and doors. As a natural result of processing at each stage from the log to finished product, various scraps are produced. These scraps are removed from the production line by means of conveyor belts and are then ground into small fragments in machines known as "hogs." There are several of these machines at various places in the plant. As the result of the grinding operations, the scraps are more easily handled, particularly at points where the conveyor system makes right angle turns. The belts lead to a collection point outside the main buildings where the various fragments are deposited.

A portion of this material, known as "hog fuel" or "hogged fuel," is burned under the plant boilers, and the remainder is piled up outside, where it is sold or hauled away by truck to a disposal area and never used. Only that part of the fuel that is consumed by respondent under its boilers is in issue here. There is no dispute between the parties as to the facts or the amount involved.

As indicated in the pleadings, there are two taxes in issue here—a manufacturer's tax and a compensating tax. In this case, we are called upon to interpret the two taxing statutes. In interpreting those statutes, we are confronted at once by the general canon of construing legislative acts, which requires an ascertainment of the legislative intent.

■■ Judicial power is never exercised for the purpose of giving effect to the will of the courts, but always for the purpose of giving effect to the will and intent of the legislature; or, in other words, to the will of the law. The intent

of the legislature in enacting a law must be gleaned from the wording of the statute itself. *State ex rel. Port of Seattle v. Department of Public Service,* 1 Wn. (2d) 102, 95 P. (2d) 1007.

■ It must be borne in mind that, if there is any doubt as to the meaning of a taxing statute, it must be construed most strongly against the taxing power in favor of the citizen. *Weyerhaeuser Tbr. Co. v. Henneford,* 185 Wash. 46, 53 P. (2d) 308.

■ Of course, if the statute is plain and unambiguous, then there is no room for construction, and the rule will not apply. *Ernst v. Kootros,* 196 Wash. 138, 82 P. (2d) 126.

The pertinent portions of the law imposing a tax on manufacturers are:

" . . . there is hereby levied and there shall be collected from every person a tax for the act or privilege of engaging in business activities. . . .

"(b) Upon every person engaging within this state in business as a manufacturer; as to such persons the amount of the tax with respect to such business shall be equal to the value of the products manufactured, multiplied by the rate of one-quarter of one per cent;

"The measure of the tax is the value of the products so manufactured regardless of the place of sale or the fact that deliveries may be made to points outside the state." Rem. Supp. 1943, § 8370-4 [P.P.C. § 965-1].

"(j) The word 'manufacturer' means every person who, either directly or by contracting with others for the necessary labor or mechanical services, manufactures for sale or commercial use from his own materials or ingredients any articles, substances or commodities. When the owner of equipment or facilities furnishes, or sells to the customer prior to manufacture, all or a portion of the materials that become a part or whole of the manufactured article, the Tax Commission shall prescribe equitable rules for determining tax liability;

"(k) The term 'to manufacture' embraces all activities of a commercial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result thereof a new, different or useful article of tangible personal property or substance of trade or commerce is produced and shall include the production or fabrication of special made or custom made articles;

"(1) The term 'commercial use' means the following uses of products by the extractor or manufacturer thereof:

"(1) Manufacturing of articles, substances or commodities from extracted products;

"(2) Leasing or renting of extracted or manufactured products;

"(3) Consigning, shipping or transferring extracted or manufactured products to another either without consideration or in the performance of contracts;

"(4) Any other use of products extracted or manufactured on a commercial scale under such rules and regulations as the Tax Commission shall prescribe." Rem. Supp. 1945, § 8370-5.

Before respondent may be taxed as here attempted, it must appear that it was engaged in the manufacture of hog fuel.

*Seeberger v. Castro*, 153 U. S. 32, 38 L. Ed. 624, 14 S. Ct. 766, indicates the path to be followed in this case. That case is so much in point that we deem it necessary to state the facts upon which it was based, and set out a liberal quotation from the opinion. The facts were:

"The Rayner & Baxter Cigar Company imported the tobacco in question, which consisted of 'clippings from the ends of cigars and pieces broken from the tobacco of which cigars are manufactured in the process of such manufacture, the said clippings and pieces not being fit for any use in the condition in which the same are imported, and their only use being to be manufactured into cigarettes and smoking tobacco.' The collector assessed upon the tobacco a duty of forty cents per pound, under Rev. Stat. § 2502 as amended by the act of March 3, 1883, c. 121, 22 Stat. 488, 491, 503, which took effect on March 3, 1883, including it within the terms of the fifth paragraph of Schedule F of that act, which reads as follows: 'Tobacco, manufactured, of all descriptions, and stem tobacco, not specially enumerated or provided for in this act, forty cents per pound.' "

After calling attention to an opinion of the attorney general and two Federal court cases, the supreme court stated:

"It seems to us, however, that both the meaning of the word 'manufactured' and the analogy of the internal revenue provisions require us to hold that these scraps are not manufactured tobacco. The court below found in this case

that the scraps were 'clippings from the ends of cigars and pieces broken from the tobacco of which cigars are manufactured in the process of such manufacture; that said clippings and pieces are not fit for any use in the condition in which the same are imported, and that their only use is to be manufactured into cigarettes and smoking tobacco.' It is thus evident that the clippings are the mere waste resulting from a process of manufacture, and not in themselves manufactured articles. In *Lawrence v. Allen*, 7 How. 785, 794, the process of manufacturing was defined to be 'making an article either by hand or machinery into a new form, capable of being used and designed to be used in ordinary life.' A like view of what constitutes an article of manufacture had been previously announced by the Court of King's Bench: "The word "manufacture" has been generally understood to denote either a thing made which is useful for its own sake and vendable as such,' etc. *Rex v. Wheeler*, 2 B. & Ald. 349. In *Holden v. Clancy*, 58 Barb. 590, the test of whether an article was manufactured is thus defined: 'A manufacture is defined as the process of making anything by art, or of reducing materials into a form fit for use by the hand or by machinery; and it seems to imply a proceeding wherein the object or intention of the process is to produce the article in question. The residuum or refuse of various kinds of manufactories is more or less valuable for certain purposes, and may be, and often is, the subject of sale; but it is not expected that the skill and attention of the manufacturer is to be devoted to the quality of the refuse material. This is not the object of the process, and its quality is wholly subordinate and disregarded, when attention to it would interfere with the most profitable mode or material to be used in the process which is the main object of the manufacturer.' Tested by either of these definitions, the tobacco in question is unmanufactured. To speak of it as 'partly manufactured,' and deduce a contention therefrom, is simply to assume the question at issue."

It is argued, however, that the definitions of "manufacturer" and "to manufacture" as set out in the statutes of this state are so different from the ordinary meaning of the terms as to preclude the application of the reasoning of the cited case. We cannot agree with that contention. The meaning of the word "manufacture" as defined in *Holden v. Clancy*, 58 Barb. 590, cited in the *Seeberger* case, is no

different from our statutory definition. In other words, our · legislature, in defining "to manufacture," simply adopted·the common-law meaning of that term.

Another case having a bearing upon the question presented here is that of *People ex rel. New England Dressed Meat and Wool Co. v. Roberts*, 155 N. Y. 408, 50 N. E. 53. In that case, the state attempted to impose a manufacturer's tax upon a corporation. The quotation which follows indicates the activities of the corporation and the holding of the court:

"Briefly stated, the principal business carried on by the relator was the purchasing of sheep and lambs, slaughtering them, pulling the wool from the hides or pelts, selling it, selling the hides, taking from the animals the offal, including the blood and legs, converting it into fertilizer, and then reducing the carcasses to a temperature which would retard decomposition, and shipping them to the place of delivery in refrigerator cars. We think this does not constitute 'carrying on manufacture' within the spirit and meaning of the statutes.

"The business conducted by the relator was obviously that of purchasing, slaughtering and selling sheep and lambs. While it utilized the hides, the wool, the tallow and the offal, as well as the carcasses of these animals, yet, to say that refrigerated mutton, rendered tallow, pulled wool or untanned hides were manufactured articles would be quite incorrect. The words of a statute are to be given their natural, plain, obvious and ordinary signification. To say that the relator was engaged in manufacturing mutton, wool, hides or tallow, would not be giving to the words 'manufacture' or 'manufactures' their ordinary and plain meaning. It may be that the fertilizer might be regarded as a manufactured article, but that was not the principal business in which the relator was engaged, but was a mere incident to it. Manifestly, none other of these articles was manufactured. At most, they were merely prepared for market and preserved until sold. We are clearly of the opinion that the relator was not a manufacturing corporation, nor engaged in 'carrying on manufacture' in this state, within the spirit and meaning of the statutes."

According to the facts, respondent was not engaged in the business of manufacturing hogged fuel, but was engaged in· the business of manufacturing and selling plywood

and doors. There was admittedly a certain waste which resulted from the manufacturing process, and it was necessary, in order to continue the manufacture of plywood and doors, that the waste product be taken from the plant in some manner. The method used by respondent was to take the waste material by conveyor belts to a place where it could be ground and converted into fuel.

There is no essential difference between the activities of the tobacco and meat companies in the cases from which we have just quoted and those of the respondent here. These companies were engaged in business, but not in the business of converting waste materials. Those activities were only incidental to the real business conducted by them.

It is our conclusion that the state tax commission was without authority to impose a manufacturer's tax upon the hog fuel used in respondent's own furnaces.

The pertinent parts of the compensating tax read:

". . . there is hereby levied and there shall be collected from every person in this state a tax or excise for the privilege of using within this state any article of tangible personal property purchased at retail or produced or manufactured for commercial use or acquired by gift. . . . Such tax shall be levied and collected in an amount equal to the value of the article used by the taxpayer multiplied by the rate of three per cent." Rem. Supp. 1943, § 8370-31 [P.P.C. § 967-1].

"(a) The term 'value of the article used' shall mean the consideration paid or given or contracted to be paid or given by the purchaser . . . In case the article used is acquired by gift or is produced or manufactured by the person using the same . . . the value of the article used shall be determined as nearly as possible according to the retail selling price at place of use of similar products of like quality and character under such rules and regulations as the Tax Commission may prescribe." Rem. Supp. 1945, § 8370-35.

It will be noted that the compensating tax is imposed only upon personal property purchased at retail, or manufactured for *commercial use.* Our conclusion as to whether or not the compensating tax could be levied upon the hog

fuel burned in respondent's furnaces depends entirely upon whether or not the burning of the hog fuel was for a commercial use. It is the contention of respondent that the fuel sought to be taxed was consumed for an *industrial* and not a *commercial* purpose. Respondent was engaged in an industrial enterprise, and the fuel, if burned in its furnace, was used in industry, and not in commerce. A tax may not be levied unless the statutory definition of commercial use embraces industrial use. As we have indicated, the revenue act defines commercial use, but makes no definition of industrial use, nor does the definition of commercial use include industrial use.

██ Appellant has called special attention to that portion of the statute which fixes a value upon articles when "acquired by gift or is produced or manufactured by the person using the same." There would be much merit in appellant's contention if the words to which we have just referred stood alone. Statutes must, however, be construed together, and not by separate or separated sections. The quoted words do not in any way change or modify the basic idea contained in the act. The basic thought is that only goods manufactured or produced for *commercial use* should be taxed. If, in the case before us, the goods were used by the manufacturer for commercial use, the provision above set out would apply.

It is our conclusion that the legislature in passing the compensating tax act had no thought of imposing a tax upon articles such as hog fuel, burned in the maker's own furnaces, but that the legislature intended only to levy a tax upon such an article if it was used *commercially*—that is, sold in the ordinary way of selling commodities of that kind, and delivered to the purchaser.

██ Our attention has been called to the testimony given by a member of the state tax commission to the effect that for many years a compensating tax has been collected by the commission upon by-products such as hog fuel, and that the legislature has never sought, by legislative action, at least, to change or modify the law as interpreted by the state tax commission.

We recognize the rule that, in cases in which a department or commission charged with the administering of an act has given it a certain interpretation over a considerable period of time, the action of the board, department, or commission will be entitled to considerable weight in determining the intent of the legislature—that is, in cases where there is an ambiguity in the statute itself and the legislature has failed to act, the construction placed upon the statute by the commission or office will be considered as persuasive. *Smith v. Northern Pac. R. Co.*, 7 Wn. (2d) 652, 110 P. (2d) 851. It does not seem to us, after a careful consideration that there is any ambiguity in the statute. For that reason, the rule laid down in the case just cited does not apply. See *Long v. Thompson*, 177 Wash. 296, 31 P. (2d) 908.

Because the tax has been paid by respondent or other manufacturers, is no warrant for imposing the tax. A wrong cannot be transferred into a virtue or sanctioned by reason of age and acquiescence. A power may be long exercised in violation of the statute, but this does not authorize the infraction.

It is our conclusion that the judgment of the trial court was entirely correct. It will therefore be affirmed.

BEALS, ROBINSON, SCHWELLENBACH, and HILL, JJ., concur.