[No. 46980-6. En Banc. August 27, 1981.]

MAC AMUSEMENT COMPANY, ET AL, *Respondents,*
v. THE DEPARTMENT OF REVENUE,
*Appellant.*

964

*Kenneth O. Eikenberry, Attorney General, Leland T. Johnson, Senior Assistant,* and *Michael Madden, Assistant,* for appellant.

*Bogle & Gates, John T. Piper,* and *James H. Lowe,* for respondents.

*Norm Maleng, Prosecuting Attorney, William C. Severson, Deputy, Douglas N. Jewett, City Attorney,* and *Jorgen G. Bader, Assistant,* amici curiae for respondents.

*Fenton P. Wilkinson* on behalf of Alpine/Burtco, amicus curiae.

UTTER, J.—Mac Amusement Company and Mackey & Aubin Concessions Company (hereinafter MAC) brought this action, seeking a refund of taxes assessed pursuant to RCW 82.29A. RCW 82.29A provides for a 12 percent tax, assessed against lessees, on the rent paid for publicly owned property. The trial court held that the rent attributable to favorable location and to monopoly rights is not taxable under that chapter. As to favorable location, we disagree.

MAC is the lessee and operator of the Fun Forest amusement facility at the Seattle Center. Its lease agreement provides, among other things, for a favorable location among pedestrian traffic, for the exclusive right to operate all rides and games at the Center, and for the sole right to sell food within the Fun Forest location. For those rights and others, MAC pays one rental sum. The portion of rent attributable to each right is not stipulated in the lease agreement.

Upon paying its taxes in 1976 and 1977, MAC sued for a partial refund, claiming that part of its leasehold rent was

attributable to its monopoly rights and favorable location. This sum, it argued, constitutes a nontaxable "concession or other rights" under RCW 82.29A.020(2)(a).

After hearing expert testimony, the trial court reduced the assessments, concluding that a portion of MAC's payments were for concessions or other rights. From that judgment, both parties appeal. MAC challenges the rental area used for the tax computation. The State argues that MAC's rent is fully taxable.

In resolving this problem, we are faced with two conflicting rules of statutory construction. The first states that if there is any doubt as to the meaning of a tax statute, it must be construed against the taxing power. *Foremost Dairies, Inc. v. State Tax Comm'n,* 75 Wn.2d 758, 453 P.2d 870 (1969); *Buffelen Lumber & Mfg. Co. v. State,* 32 Wn.2d 40, 43, 200 P.2d 509 (1948). The other is that tax exemptions are to be strictly construed in favor of the tax and, as a corollary, they are not to be extended beyond the scope clearly indicated by the legislature. *Evergreen–Washelli Memorial Park Co. v. Department of Revenue,* 89 Wn.2d 660, 574 P.2d 735 (1978); *Pacific Northwest Conference of Free Methodist Church of N. America v. Barlow,* 77 Wn.2d 487, 493–94, 463 P.2d 626 (1969).

We are mindful that, in most situations, statutory words are to be given their ordinary and usual meanings. *Strenge v. Clarke,* 89 Wn.2d 23, 569 P.2d 60 (1977); *Rena–Ware Distribs., Inc. v. State,* 77 Wn.2d 514, 463 P.2d 622 (1970). But in this case the dispositive words cannot be given their customary definitions. In judicial and common usage, the term "concession" is often used interchangeably with the words "lease" and "grant." *See generally* 8 *Words and Phrases* 106 (Supp. 1981). Yet, within RCW 82.29A, the latter two describe taxable events, while the former does not. Therefore, as used in that chapter, the term "concession" has a meaning different from that ordinarily ascribed to it. *See Strenge, supra; Rena–Ware, supra.*

Similarly, the phrase "other rights" is also not defined. Thus, the exemptive language must be construed

in light of the purpose for the tax. *Id.* That purpose, as revealed by RCW 82.29A.010, is as follows:

> The legislature hereby recognizes . . . that private lessees of . . . public properties receive substantial benefits from governmental services provided by units of government.
>
> . . .
>
> The legislature finds that lessees of publicly owned property are entitled to those same governmental services and does hereby provide for a leasehold excise tax to fairly compensate governmental units for services rendered to such lessees of publicly owned property.

## I

RCW 82.29A.030 provides:

> There is hereby levied and shall be collected a leasehold excise tax on the act or privilege of occupying or using publicly owned real or personal property through a leasehold interest on and after January 1, 1976, at a rate of twelve percent of taxable rent . . .

For the purposes of this case, the taxable rent is the "contract rent," which is defined as

> the amount of consideration due as payment for a leasehold interest, including: The total of cash payments made to the lessor or to another party for the benefit of the lessor according to the requirements of the lease or agreement; expenditures for the protection of the lessor's interest when required by the terms of the lease or agreement; and expenditures for improvements to the property to the extent that such improvements become the property of the lessor. *Where the consideration conveyed for the leasehold interest is made in combination with payment for concession or other rights granted by the lessor, only that portion of such payment which represents consideration for the leasehold interest shall be part of contract rent.*

(Italics ours.) RCW 82.29A.020(2)(a).

The first issue involves interpreting the emphasized portion of the statute, for RCW 82.29A does not provide a definition of "concession or other rights."

The trial court concluded that the rent attributable to the monopoly rights and to having access to the Center's

pedestrian traffic was not taxable. Instead, it ruled that the taxable rent was simply the rent which anyone would pay for similar–sized areas with similar improvements near the Seattle Center.

The State argues that "concession or other rights," as used in RCW 82.29A.020, refer only to those rights unrelated to the possession and use of public property. It believes that MAC's monopoly rights and favorable location are inseparable from the leasehold and thus are taxable.

█ In light of the tax's purpose, the portion of the rent attributable to favorable location, and to having access to the "stream of commerce," must be taxable. The City expends large sums to promote activities and to provide services within the Center. To the extent that the court's ruling exempts the rent traceable to that "access" and location, it defeats the purpose of the tax.

A similar conclusion is suggested by RCW 82.29A-.020(2)(b), which provides:

> If it shall be determined by the department of revenue . . . that such leasehold interest has not been . . . negotiated under circumstances . . . clearly showing that the contract rent was the maximum attainable by the lessor, the department may establish a taxable rent computation for use in determining the tax payable under authority granted in this chapter based upon the following criteria: (i) *Consideration shall be given to rental being paid to other lessors by lessees of similar property for similar purposes over similar periods of time . . .*

(Italics ours.) That statute, though not directly applicable to this case, suggests that taxable rent is at least that rent paid for similar property used for similar purposes. The similar purposes and property restriction, in turn, connotes that location is a factor in the tax equation. The restriction acknowledges that properties differ, that differing characteristics affect the rent paid, and that taxable rent should vary with those differing characteristics. One differing characteristic is location and access to commerce.

MAC's arrangement is not substantially different from that of a lessee in a shopping center owned by a single les-

sor. Each has chosen its location on the basis of access to the commercial traffic generated by the lessor. In each, access is an inherent element of the location.

The attempt to segregate from the rent that portion relating to favorable location seems to us to be contrary to the stated legislative purposes for the tax, and we therefore hold that the rent traceable to "good location" is taxable under RCW 82.29A.

## II

The State argues that the exclusivity rights should be taxed because their value is also dependent upon the promotional activities, and hence expenditures, of the City. MAC argues, however, that such is inconsistent with a reading of the entire statutory scheme.

According to the scheme, the taxable event is a leasehold interest, RCW 82.29A.020(2)(a), which is

an interest in publicly owned real or personal property which exists by virtue of any lease, permit, license, or any other agreement, written or verbal, between the public owner of the property and a person who would not be exempt from property taxes if that person owned the property in fee, granting possession and use, to a degree less than fee simple ownership . . .

RCW 82.29A.020(1).

In contrast to a leasehold, a monopoly right when conferred by a municipality is generally considered to be a franchise. *Washington Water Power Co. v. Rooney*, 3 Wn.2d 642, 101 P.2d 580, 127 A.L.R. 1044 (1940); *Artesian Water Co. v. State Dep't of Highways & Transp.*, 330 A.2d 432 (Del. Super. Ct.), *aff'd as modified*, 330 A.2d 441 (Del. 1974); *Dunmar Inv. Co. v. Northern Natural Gas Co.*, 185 Neb. 400, 176 N.W.2d 4 (1970). A franchise is

the right granted by the state or a municipality to an existing corporation or to an individual to do certain things which a corporation or individual otherwise cannot do . . .

*Rooney*, at 649, quoting E. McQuillin, *Municipal Corporations* § 1740 (2d ed. 1943). *Accord, Artesian, supra.* It is

distinguishable from leaseholds, licenses, and permits—the terms used in RCW 82.29A to define "leasehold interests." *Artesian, supra; Dunmar, supra; Lanham v. Forney,* 196 Wash. 62, 81 P.2d 777 (1938); *Greene Line Terminal Co. v. Martin,* 122 W. Va. 483, 10 S.E.2d 901 (1940); *Miller v. Owensboro,* 343 S.W.2d 398 (Ky. Ct. App. 1961). It remains distinct from a leasehold even when its exercise and value is inherently dependent upon the use and possession of publicly owned property. *Artesian, supra; Hayden v. Houston,* 305 S.W.2d 798 (Tex. Civ. App. 1957); *Glodt v. Missoula,* 121 Mont. 178, 190 P.2d 545 (1948). On the basis of these long–standing distinctions, we believe the exclusivity rights in this case constitute such a franchise and therefore must be nontaxable "other rights granted by the lessor."

To tax franchise rights would render meaningless the phrase "concession or other rights." If monopoly rights do not fall within that category, it is difficult to envision what would. We must give effect to all statutory phrases, *Knappett v. Locke,* 92 Wn.2d 643, 600 P.2d 1257 (1979); *Washington Water Power Co. v. State Human Rights Comm'n,* 91 Wn.2d 62, 586 P.2d 1149 (1978), and thus franchise rights, such as the exclusivity rights in this case, are not taxable under RCW 82.29A.

## III

■ The final issue, appealed by MAC, is whether the trial court incorrectly included pedestrian thoroughfares, intersecting the Fun Forest area, in its computation of the taxable square footage in MAC's leasehold interest. The court determined taxable rent to be the rent one might pay for similar–sized property surrounding the Center. By including the thoroughfare areas, the square footage and thus the taxable rent were increased. Their inclusion, MAC asserts, overstated the tax assessment by 60 percent. It claims that these areas were improperly considered since they are public in nature.

By definition, the taxable rent is that rent paid for a "leasehold interest," which is defined as not only including

leases, but also permits and licenses. RCW 82.29A.020(1). The taxable rent additionally includes those sums paid for the *use* as well as the possession of public property. RCW 82.29A.030. From these provisions, it would appear the legislature intended to tax those areas the use of which was bargained for. Those provisions, by including uses and permits, give "leasehold" a meaning not ordinarily contemplated by that term.

Taxing the use as well as possession of property is consistent with the purpose of the tax. The tax is intended to defray some of the governmental expense of maintaining areas from which private lessees benefit. In this case, while MAC derives substantial benefits from their existence, the City maintains the walkways and is liable for any injuries arising from them.

The lease itself suggests that the use of those walkways was bargained for and constitutes a part of the aggregate rent. It provides:

> *The City agrees to make available to the Licensees* for the operation of the Fun Forest the following buildings and areas, which shall hereinafter be referred to as "premises":
> The Midway (Games) Building Nos. 400, 401, 402 and 403; the Arcade, Building No. 404; the Restaurant, Building No. 173; the Office, Building No. 39; Food Kiosks Nos. 409 and 422; the Mini Golf Course, Building No. 79; the ticket booths in the east and west sections of the major ride area; *the Kiddie Land area and the Central area;* the ground space for ride pads; the South ½ of the North ⅓ Section of Building No. 50 for storage, hereinafter referred to as "Space A"; the shop and storage area located on the first floor, east side of the Food Circus Building, *except the passageway area running north and south,* and except the wash rack and the two south rooms in said shop and storage area, hereinafter referred to as "Space B"; and the present cash control room, concession work shop and storage, and the office space located in the northeast section of the basement level of the Food Circus Building, hereinafter referred to as "Space C"; all as indicated on the attached map marked Exhibit "A".

(Italics ours.)

The lease explicitly excepts one passageway from the rented premises and elsewhere confers entire areas intersected by walkways. In contrast the walkways which are primarily for Center activities, those on the fringe of the rented areas, were not considered in determining the taxable rent. Moreover, the rented areas would be worthless without the intersecting passageways and thus it is logical to assume that those thoroughfares were a part of the consideration for the lease. As stated by the trial court:

> The walkways that are primarily for other Center activities, and apparently there are some of them on the fringe of this area, I understand, have already been deducted or at least were not included in this survey that is Exhibit No. 2, I believe. . . . I think any disadvantage that Mac Amusement would have had because of the fact that other people would be walking through the Fun Forest and the Kiddieland would be more than offset for the advantage that's been suggested of being in the stream of commerce.
>
> This is one of the concessions or one of the valuable rights that Mac Amusement is receiving from the Center, so I'm going to accept the square footage that is derived from Exhibit 32, rather than accept the plaintiff's suggestion that we exclude the walkways.
>
> In addition to that, I should point out that Exhibit 37 does indicate that at least a portion of the walkway is being used, and I think that just further buttresses the Court's finding in that regard.
>
> I think, in short, that the property surveyed is really an entity. I think it is a recognizable, identifiable area. I think in the Seattle Center, the Kiddieland area means something. I think the central area means something. It is an identifiable, recognizable area. It has physical boundaries, and I think the walkways within it, regardless of what agreements there are as to who might be liable for accidents that occur there and so on, should not be excluded.

Trial court oral opinion, at 8–10. Inasmuch as those intersecting thoroughfares were an element of the lease, and given the expansive definition for "leasehold interest," we

conclude that they were properly taxed.

The judgment of the trial court is consequently affirmed as to the walkways and monopoly rights and reversed to the extent that it exempted favorable location. The case is remanded for further proceedings consistent with this opinion.

ROSELLINI, STAFFORD, HICKS, WILLIAMS, and DORE, JJ., concur.

DOLLIVER, J. (concurring in part, dissenting in part)— The majority has concluded that portion of the rent attributable to favorable location and to having access to the stream of commerce is taxable. I dissent on this issue. I concur with the majority's finding that franchise rights, such as exclusivity rights in this case are not taxable under RCW 82.29A, and that the pedestrian thoroughfares intersecting the Fun Forest area may be computed in the taxable square footage in MAC's lease.

At the outset, the majority cites the rule that tax exemptions are to be strictly construed. While true, I believe this leads to an erroneous perspective of the case. The issue before the court is not to construe the scope of an exemption, but rather the scope and extent of the tax itself.

The majority states, "In light of the tax's purpose, the portion of the rent attributable to favorable location, and to having access to the 'stream of commerce,' must be taxable." The purpose of the tax is to collect from the lessees of public property certain sums "to fairly compensate governmental units for services rendered to such lessees of publicly owned property". RCW 82.29A.010. The tax is to apply to the "leasehold interest" as it is defined in the statute. Why it would "defeat the purpose of the tax" not to hold that access is an "other right" is not made clear.

I believe the difficulty with the majority analysis is that it construes access to "the stream of commerce" and access to a "favorable location" to be one and the same. This, of course, results in the conclusion that "favorable location" is

an element logically factored into the leasehold interest.

However, access "to the stream of commerce" and "favorable location" are two distinct and separate ideas. Access to the stream of commerce means much more than just a favorable location. For example, a landlord who owns a favorable location on a busy intersection has a favorable location to the flow of business traffic, yet cannot control access; there exist three other corners with virtually identical access. By contrast, certain landlords like the City of Seattle can often control access to a flow of business traffic. Their control is such that they can grant or deny access to that traffic. The City of Seattle as a landlord controls the access of business traffic—access to the stream of commerce—at Seattle Center.

As the trial court observed:

> It is a mixed question of fact and law, but here I believe the plaintiff, Mac Amusement, receives more from the City of Seattle of value than just the leasehold interest. They receive more than just a good location. . . .
>
> . . .
>
> It is really, when you boil it down to be the only carnival—I don't know if "carnival" is the right word, but I think of it in that sense—that will have access to thousands of people, I suppose, who go to the Seattle Center
> . . .

Trial court oral opinion, at 3, 5–6.

Plaintiff receives a favorable location; but it also receives more: a grant of access plus the denial of that grant to its competitors.

The trial court should be affirmed.

BRACHTENBACH, C.J., and DIMMICK, J., concur with DOLLIVER, J.