[No. 51479-8.   En Banc.   August 21, 1986.]

WEYERHAEUSER COMPANY, *Appellant,* v. THE DEPARTMENT OF REVENUE, *Respondent.*

*Helmut Wallenfels,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Joel M. Greene, Assistant,* for respondent.

BRACHTENBACH, J.—This case presents three excise tax issues. (1) Is a corporation which primarily conducts a forest products business but ships timber via time–chartered vessels as an incident of sale to its overseas timber customers a "private carrier" entitled to the statutory sales tax exemption on bunker fuel? (2) May the Department of Revenue impute interest to an installment contract sale of

timber where the contract does not provide for interest and there is no specific statutory or regulatory authority for imputing such interest? (3) Must a corporation, which has established an Employee Stock Ownership Plan (ESOP) and accordingly taken a 1 percent ESOP federal tax credit, deduct such credit from the state pollution control facility tax credit to which qualifying entities are entitled under RCW 82.34.060?

We hold that Weyerhaeuser is entitled to the fuel tax exemption; that the Department of Revenue may not impute interest to a corporation's installment sales contracts and then tax that interest at the "service" rate; and that the 1 percent ESOP federal tax credit need not be deducted from the state pollution control facility credit.

We begin our analysis, not with the facts of this case, but with the procedural history. Since the three issues raised by the Department of Revenue's assessment are unrelated to each other, the relevant facts will be set forth with the analysis of each issue.

The Department of Revenue audited Weyerhaeuser Company for the period of July 1, 1975, to December 31, 1978. Following the audit, the Department assessed retail sales tax on corporate purchases of bunker fuel. In addition, the Department assessed additional tax on interest imputed to the corporation's installment timber sales contracts. Finally, the Department deducted Weyerhaeuser's 1 percent federal ESOP tax credit from the corporation's state pollution control facility tax credit.

Weyerhaeuser appealed these assessments to the Department's hearing examiner, who ruled in favor of the Department on all three issues. Weyerhaeuser then appealed the hearing examiner's ruling to the Board of Tax Appeals. The Board ruled in favor of Weyerhaeuser on the fuel tax issue and the ESOP issue, but sustained the Department as to the imputed interest question. Weyerhaeuser then appealed to Thurston County Superior Court pursuant to RCW 34.04.130. The Superior Court found for Weyerhaeuser on the ESOP issue only, upholding the Department on the

imputed interest question and reinstating the assessment of fuel taxes. Weyerhaeuser appealed the fuel tax and imputed interest issues, and the Department appealed the ESOP question. We accepted direct review. We affirm on the ESOP question and reverse on the fuel tax and imputed interest issues.

## I
### FUEL TAX

As part of its business, Weyerhaeuser Company sells timber to Asian customers. The contracts under which Weyerhaeuser sells its timber typically provide for Weyerhaeuser to arrange for the shipping of 15 percent of the products on vessels Weyerhaeuser procures; the purchaser is responsible for transportation for the other 85 percent.

In order to provide for shipping timber under these contracts, Weyerhaeuser acquires access to vessels by means of time–chartering. As a time–charterer, Weyerhaeuser negotiates contracts or "charter parties" with various ship owners. Under these charter parties, Weyerhaeuser obtains control of the vessels in question, but ownership and general management stay with the owner. Additionally, Weyerhaeuser, as time–charterer, pays for all fuel. This fuel, which is stored aboard ship in containers known as "bunkers", is commonly referred to as "bunker fuel".

In Washington, bunker fuel purchases are exempt from retail sales tax if the purchaser uses the fuel in conjunction with the business of operating as a private or common carrier. The statute granting the fuel tax exemption is RCW 82.08.0261. It provides, in pertinent part,

> The [retail sales] tax . . . shall not apply to sales of tangible personal property . . . for use by the purchaser in connection with the business of operating as a private or common carrier by air, rail, or water in interstate or foreign commerce . . .

The parties agreed that bunker fuel is tangible personal property and that Weyerhaeuser, as purchaser, used the fuel in question in a business capacity. They further agreed

that the shipments of timber were made by water, and that these shipments to Asia represented foreign commerce. The dispute centered on whether the corporation qualified as a "carrier" for purposes of the exemption.

Weyerhaeuser cannot be a "common carrier," because Weyerhaeuser does not hold itself out to the public as ready to carry indiscriminately for all persons. *See Cushing v. White,* 101 Wash. 172, 172 P. 229 (1918). Thus, Weyerhaeuser must be a "private carrier" in order to obtain the exemption.

"Private carrier" is not defined in RCW Title 82. However, the Legislature empowered the Department of Revenue to promulgate rules and regulations for implementing RCW Title 82. Such rules and regulations "shall have the same force and effect as if specifically included therein . . ." RCW 82.32.300.

Pursuant to the authorization of RCW 82.32.300, the Department promulgated WAC 458–20 *et seq.* Since we must construe the language of RCW 82.08.0261, and WAC 458–20 was promulgated to implement RCW Title 82, the definitions set forth in WAC 458–20 are controlling.

WAC 458–20–175 defines "private carrier." It states, in relevant part:

> The term "private carrier" means every carrier, other than a common carrier, engaged in the business of transporting persons or property for hire.

This definition may be divided into the following three elements: (1) not a common carrier, (2) in the business of transporting persons or property, (3) for hire.

It is undisputed that Weyerhaeuser is not a common carrier; thus the first element is met. For the corporation to fall within the definition of WAC 458–20–175 and therefore within the language of RCW 82.08.0261, it must also meet the "business" and "for hire" elements.

■ The Department took the position that "in the business" means that a private carrier must be *primarily* in the business of carriage. Weyerhaeuser admittedly is not in the primary business of shipping. The definition, however, con-

tains no requirement that "business" be the carrier's *primary* business.

This court, in *Boeing Co. v. Department of Licensing,* 103 Wn.2d 581, 693 P.2d 104 (1985), confronted a similar problem of statutory construction. In that case, the State argued that Boeing was not entitled to an aircraft fuel tax exemption because it was not a licensed distributor. Notwithstanding Boeing's unlicensed status, we found that Boeing was entitled to the exemption. "The statute does not state that licensing is a prerequisite to exemption entitlement." *Boeing,* at 585. Similarly, WAC 458–20–175 does not state that a prerequisite to private carrier status is that one must make carriage his primary business. Since carriers need not make carriage their primary business in order to be termed "private carriers", Weyerhaeuser cannot be denied the exemption simply because it engages in carriage as a nonprimary aspect of its business.

The Department also took the position that Weyerhaeuser cannot be a "private carrier" because it is not a carrier "for hire". The Department insisted that Weyerhaeuser "hires itself" under its contracts with Asian purchasers, because it is actually shipping logs which are still owned by the corporation.

In this instance, however, it is the purchaser, not Weyerhaeuser, who holds title to the logs being shipped. The contracts between Weyerhaeuser and purchaser explicitly provide for timber to be shipped either CIF (cost, insurance, and freight to be borne by seller) or C&F (cost and freight to be borne by seller, but insurance to be provided by purchaser). Regardless of whether a given shipment is to be made CIF or C&F, title passes to the purchaser as soon as the timber is delivered to the transporting vessel at its United States port. *See* RCW 62A.2–320, Official Comment 1 (delivery to the carrier is delivery to the buyer for purposes of risk and title). *See also* RCW 62A.2–320, Official Comment 16 (under the C&F term, as under the CIF term, title and risk of loss are intended to pass to the buyer on shipment). Thus, a fair reading of the contracts in question

together with relevant sections of RCW 62A.2–320 compels the conclusion that at all times during the ocean voyage to the port of destination the logs being shipped by Weyerhaeuser are the property of the purchaser. Because the purchaser owns this timber and has contracted with Weyerhaeuser for carriage, the purchaser has effectively hired the corporation as a carrier.

The Department argues that to find Weyerhaeuser has been hired as a carrier is to exalt form over substance. For the proposition that substance must prevail over form, the Department relies upon *Time Oil Co. v. State,* 79 Wn.2d 143, 483 P.2d 628 (1971) and *Chicago Bridge & Iron Co. v. Department of Rev.,* 98 Wn.2d 814, 659 P.2d 463, *appeal dismissed,* 464 U.S. 1013 (1983). Those cases, however, have no bearing on the present case. The substance of the shipping arrangements here is that Weyerhaeuser is hired as a carrier by purchasers to whom title and risk of loss have passed.

Because Weyerhaeuser transports logs "for hire", is "in the business" of carriage, and is "not a common carrier", the corporation falls within the "private carrier" definition of WAC 458–20–175. WAC 458–20–175 has the force of law for purposes of implementing RCW 82.08.0261, which grants the fuel tax exemption. Thus, Weyerhaeuser qualifies as a "private carrier" for purposes of that exemption.

In addition to arguing that Weyerhaeuser is not a private carrier based on the "business" and "for hire" requirements of WAC 458–20–175, the Department contended that RCW 81.80.010, not WAC 458–20–175, should determine the definition of "private carrier".

RCW 81.80.010 defines terminology as it relates to motor freight carriers. In particular, RCW 81.08.010(6) defines a private carrier, in part, as one who transports property "by his own motor vehicle". The Department reasoned that because Weyerhaeuser did not own the ships used to deliver logs to its customers, it was not transporting property in its "own vehicle". Since the corporation was not using its own ships, it could not be a private carrier under

RCW 81.80.010(6).

■ The Department's position is unpersuasive. If the Legislature had intended its motor vehicle freight carrier definitions to apply to all carriers it could have so indicated. "[W]here the Legislature uses certain statutory language in one instance, and different language in another, there is a difference in legislative intent." *UPS, Inc. v. Department of Rev.*, 102 Wn.2d 355, 362, 687 P.2d 186 (1984); *Van Dyk v. Department of Rev.*, 41 Wn. App. 71, 702 P.2d 472 (1985) (where different statutory language is used, there is a difference in legislative intent which courts cannot alter).

We find that Weyerhaeuser qualifies as a private carrier. Accordingly, we reverse the Superior Court and hold that Weyerhaeuser is entitled to the fuel tax exemption.

## II
### IMPUTED INTEREST

Weyerhaeuser sold standing timber under "lump sum" contracts whereby purchasers were typically required to pay 10 percent down, with the balance in three to four annual installments. On the vast majority of these contracts, Weyerhaeuser charged no interest on the unpaid balance. The corporation cited convenience, simplicity, and trade custom as reasons for this practice.

Where contracts specifically provided for interest, Weyerhaeuser segregated the gross proceeds from the interest. Weyerhaeuser then paid business and occupation tax on the gross proceeds at the "wholesale" rate specified in RCW 82.04.270(1) and paid tax on the interest at the "service" rate set forth in RCW 82.04.290. All parties agree this was proper.

Where the contract did not specifically provide for interest, Weyerhaeuser reported the entire contract price as gross proceeds taxable under the lower wholesaling rate. This tax treatment was given these "no–interest" contracts despite the fact that Weyerhaeuser's accountants, pursuant to generally accepted accounting principles, internally com-

puted an interest component at the prevailing rate, segregated that interest, and placed the interest proceeds in a separate account. Weyerhaeuser had to comply with these accounting principles pursuant to the requirements of the New York Stock Exchange and the Securities and Exchange Commission.

The Department, the Board, and the trial court all found that this segregated interest component should be imputed to Weyerhaeuser and taxed as if it were interest specified in the contract. We disagree.

WAC 458-20-109, RCW 82.04.290, and RCW 82.04.270 control this issue. WAC 458-20-109 provides, in relevant part: "Persons who receive . . . interest are taxable with respect thereto under the service . . . classification." The service classification rate is established at 1.50 percent by RCW 82.04.290 (at all times relevant to this dispute, the service rate under RCW 82.04.290 was 1 percent). RCW 82.04.270 establishes the wholesaling rate at .44 percent, and makes sales of timber such as those in the present case taxable at the wholesaling rate.

Under these statutes and our cases, it is settled that where a contract for wholesaled goods specifically provides for interest, the interest and wholesaling components are taxed at their respective rates. *Rena–Ware Distribs., Inc. v. State,* 77 Wn.2d 514, 463 P.2d 622 (1970); *Clifford v. State,* 78 Wn.2d 4, 469 P.2d 549 (1970); *Department of Rev. v. J.C. Penney Co.,* 96 Wn.2d 38, 633 P.2d 870 (1981).

In this case, however, the contracts did not specifically provide for interest. No interest was separately contracted for with the corporation's timber buyers and no interest was separately "received". Weyerhaeuser's own interest computations were merely an internal bookkeeping device. Because WAC 458-20-109 applies only to "[p]ersons who *receive* . . . interest", that section cannot be construed to apply to imputed interest. (Italics ours.)

What the Department wishes to do in this case is to impute contract interest to Weyerhaeuser, and then impose a higher tax rate on that interest. The controlling statutory

language as it now exists simply provides no authority for such imposition. We are guided in this instance by ordinary rules of statutory construction. Any doubts as to the meaning of a statute under which a tax is sought to be imposed will be "construed against the taxing power." *Duwamish Warehouse Co. v. Hoppe,* 102 Wn.2d 249, 254, 684 P.2d 703 (1984); *Mac Amusement Co. v. Department of Rev.,* 95 Wn.2d 963, 966, 633 P.2d 68 (1981).

We hold that, where an installment contract for the sale of timber does not provide for interest, the Department of Revenue may not impute such interest without specific statutory or regulatory authority.

In reaching our holding we are not unmindful that certain taxpayers may attempt to circumvent higher taxation rates by simply refusing to specify interest on their installment contracts. Such circumvention of tax laws may be addressed by statute. *See, e.g.,* 26 U.S.C. § 483 (1964) (interest is to be imputed to installment sales of capital assets). *See also Jeffers v. United States,* 556 F.2d 986, 991 (Ct. Cl. 1977) (reason for enactment of 26 U.S.C. § 483 was to prevent buyers from structuring transactions such that ordinary income—interest—could be converted into capital gain merely by including the interest element in the purchase price).

## III
## ESOP

The Employee Stock Ownership Plan issue involves the interaction of two tax statutes—one federal and one state.

The federal statute is the Tax Reduction Act of 1975, sections 301(a) and (d), through which Congress provided, among other things, tax credits for ESOP's in an effort to broaden employee ownership of stock in employer corporations. The pertinent language of sections 301(a) and (d), as summarized by Commerce Clearing House and stipulated to by the parties, is as follows:

> To . . . stimulate the economy, the Tax Reduction Act of 1975 raises the investment tax credit rate from 7% to

> 10% . . .
>
> In the case of a corporate taxpayer, an 11% credit may be claimed . . . if the extra 1% is contributed to an employee stock ownership plan funded by transfers of employer securities. The 1% contribution must be made immediately upon receiving the 11% claim, adjustment or refund.

Clerk's Papers, at 9.

This statute also sets forth additional requirements for a valid ESOP. Weyerhaeuser, after deciding in 1975 to set up an ESOP, fully complied with all pertinent aspects of the Tax Reduction Act of 1975. Accordingly, Weyerhaeuser claimed on its federal tax return the full 11 percent tax credit to which it was entitled—1 percent for its ESOP and 10 percent investment tax credit for its pollution control facilities.

The state statute in question is RCW 82.34.060, which, to some extent, must be applied in conjunction with the above federal statute. RCW 82.34.060 provides generally that entities which construct pollution control facilities are entitled to certain tax credits against state excise taxes. Some limits have been imposed on the availability of these state tax credits. Of relevance here is the limitation of RCW 82.34.060(2)(d), which provides:

> The total cumulative amount of credits against state taxes authorized by this chapter shall be reduced by the total amount of any federal investment credit or other federal tax credit actually received by the certificate holder applicable to the facility. . . .

Based on the above provision, Weyerhaeuser offset its 10 percent federal investment tax credit against its state tax credit. The corporation did not, however, deduct its 1 percent ESOP credit. The Department assessed Weyerhaeuser the amount of its 1 percent credit, arguing that the ESOP credit was a "federal investment credit" contemplated by RCW 82.34.060(2)(d). The hearing examiner agreed with the Department, but both the Board and the Superior Court found for Weyerhaeuser. We agree with the Board and the Superior Court.

■ The state statute in question, RCW 82.34.060(2)(d), may be subdivided into three elements: (1) the certificate holder (taxpayer) must receive federal tax credit; (2) the credit must be applicable to the pollution control facility; and (3) the certificate holder must *actually receive* the credit. The parties agreed that the first two elements were met: federal tax credits were available to and claimed by Weyerhaeuser, and the credit was applicable to the corporation's pollution control facility. The parties disagreed as to whether Weyerhaeuser actually received the federal tax credit.

*Webster's Third New International Dictionary* 1894 (1976) defines "receive" as "to take . . . [or] accept". The Department insisted that Weyerhaeuser actually "received" the tax credit when it in fact "took or accepted" the credit on its federal tax return.

Even though Weyerhaeuser took the credit, it is apparent to us that the corporation never actually received the 1 percent federal credit because it was acting as a mere conduit for its employees. Weyerhaeuser employees, as beneficiaries of the ESOP, were the beneficiaries of the credit. We agree with the Board, which characterized the 1 percent ESOP investment tax credit as "an immediate pass–through to . . . employees." Clerk's Papers, at 17. Moreover, in looking at the economic realities of the 1 percent credit, it is clear that the 1 percent credit does not represent profit to Weyerhaeuser. What the corporation obtained in credit it immediately transferred to the ESOP. In effect, the corporation exchanged a tax liability for an employee plan liability.

Finally, we interpret the intent of the Legislature in creating the limitations on state tax credits in RCW 82.34.060 to be the prevention of double benefits to entities for a single pollution control facility. In this case, the corporate employees, rather than the corporate entity itself, benefited from creation of the ESOP. Weyerhaeuser's 1 percent federal tax credit in return for a 1 percent contribution to an ESOP does not result in a double benefit to the corpora-

tion.

For the foregoing reasons, we affirm the Superior Court and find that the 1 percent ESOP credit need not be deducted from the state pollution control facility credit.

DOLLIVER, C.J., UTTER, DORE, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., and VERHAREN, J. Pro Tem., concur.