[No. 22357-1-II. Division Two. November 13, 1998.]

CRYSTAL CHALETS ASSOCIATION, ET AL., *Respondents*, v. PIERCE COUNTY, *Appellant*.

72

*John W. Ladenburg, Prosecuting Attorney*, and *Robert P. Dick, Deputy*, for appellant.

*William J. McDowell*, for respondents.

SEINFELD, J. — In this tax case, owners of residential condominiums located on United States government land that is designated as national forest challenged Pierce County's valuation of their properties. The trial court, applying RCW 84.40.030(2), ordered the County assessor to substitute as the assessed values the cost of reconstruction less depreciation instead of comparable sales data. We conclude that the units are not "being used under terms of a franchise" and that, therefore, RCW 84.40.030(2) does not mandate exclusive use of the cost less depreciation method of valuation. Thus, we reverse.

## FACTS

The United States Forest Service leases land under a Term Special Use Permit to Crystal Mountain, Inc. (CMI), a Washington corporation. CMI subleases the land to the plaintiffs in this lawsuit, owners of 35 individual condominium units in a development called Crystal Chalets Association.

The Term Special Use Permit requires CMI to pay an annual permit fee (ground rent) based on a percentage of the gross income generated by public rentals of the condominium units and a percentage of the gross value of the Owners' use of their own units. Pursuant to RCW 82.29A.030, the County assesses a leasehold excise tax against CMI based on 12 percent of the taxable rent.[1]

The law also requires the Owners to pay a separate

---

[1]When the Legislature enacted this leasehold excise tax on the *rent* paid to use publicly owned property, it exempted private leasehold interests in publicly owned property from ad valorem property taxation. *See* RCW 84.36.451; *Duwamish Warehouse Co. v. Hoppe*, 102 Wn.2d 249, 254, 684 P.2d 703, 57 A.L.R.4TH 939 (1984).

personal property tax on any improvements.[2] RCW 84.04.080; RCW 84.40.030; RCW 84.40.040. For at least five years before the filing of this lawsuit, the County valued the improvements based upon comparable sales of units within the Crystal Chalets community. The assessments did not include the value or use of the federal land upon which the condominiums were constructed.

Pursuant to RCW 84.68.020, the Owners paid the assessed taxes under protest. In September 1993, they challenged the assessed values of their improvements before the County Board of Equalization. After the Board sustained the assessor's valuation, the Owners filed an action in superior court seeking a reduction in the assessed value and a refund of taxes paid in violation of RCW 84.36.451. The Owners contended that the County's valuation method improperly included the value of their leasehold estates, which are exempt from taxation under RCW 84.36.451. They further contended that RCW 84.40.030(2) mandates use of "replacement cost less depreciation" as the valuation method because their property is used "under terms of a franchise from a public agency."

The County presented evidence of the assessed value based upon comparable sales; it also invoked the presumption of correctness under RCW 84.40.0301. The Owners presented figures showing replacement cost less depreciation, which produced a lower valuation.

The trial court granted the Owners' motion for summary judgment. Instead of granting a money judgment, it ordered the County to determine the property values for certain past years using the replacement minus depreciation method of valuation and then to pay refunds to the Owners based upon the difference between the two valuation methods. Pierce County appeals.

---

[2]The Legislature's 1976 reform of public leasehold taxation was specifically intended to permit the assessor to tax separately any improvements on privately leased, publicly owned lands. *Duwamish*, 102 Wn.2d at 254.

## DISCUSSION

## I

The County argues that cases construing RCW 84.40.030 give assessors broad discretion to choose valuation methods when valuing private property on tax-exempt, government-owned land. It also asserts that RCW 84.40.030's second paragraph, by its own terms, applies only to *real* property. Thus, the County contends that the trial court erroneously applied RCW 84.40.030 to the Owners' *personal* property interests in their condominiums. Finally, the County argues that even if RCW 84.40.030(2) applied generally to this type of property interest, it would not mandate exclusive use of the cost less depreciation method because the Owners' personal property interests are not held "under terms of a franchise from a public agency."

RCW 84.40.030[3] provides the starting point for all property valuation. It states that "all real property 'shall be

---

[3]RCW 84.40.030, revised 1997, provides:

"All personal property shall be valued at one hundred percent of its true and fair value in money and assessed on the same basis unless specifically provided otherwise by law.

"All real property shall be appraised at one hundred percent of its true and fair value in money and assessed as provided in RCW 84.40.0305 unless specifically provided otherwise by law.

"Taxable leasehold estates shall be valued at such price as they would bring at a fair, voluntary sale for cash without any deductions for any indebtedness owed including rentals to be paid.

"The true and fair value of real property for taxation purposes (including property upon which there is a coal or other mine, or stone or other quarry) shall be based upon the following criteria:

"(1) Any sales of the property being appraised or similar properties with respect to sales made within the past five years. The appraisal shall be consistent with the comprehensive land use plan, development regulations under chapter 36.70A RCW, zoning, and any other governmental policies or practices in effect at the time of appraisal that affect the use of property, as well as physical and environmental influences. An assessment may not be determined by a method that assumes a land usage not permitted, for that property being appraised, under existing zoning or land use planning ordinances or statutes. The appraisal shall also take into account: (a) In the use of sales by real estate contract as similar sales, the extent, if any, to which the stated selling price has been increased by reason of the down payment, interest rate, or other financing terms; and (b)

valued at one hundred percent of its true and fair value in money and assessed on the same basis unless specifically provided otherwise by law.' " *See Sahalee Country Club, Inc. v. Board of Tax Appeals*, 108 Wn.2d 26, 29, 735 P.2d 1320 (1987) (quoting RCW 84.40.030). The court must presume that the assessor's valuation of property is correct unless the taxpayer contradicts the valuation with clear, cogent, and convincing evidence. RCW 84.40.0301.

· After the Legislature's enactment of the leasehold excise tax, RCW 82.29A, the Supreme Court in *Duwamish Warehouse Co. v. Hoppe*, 102 Wn.2d 249, 684 P.2d 703, 57 A.L.R.4TH 939 (1984), defined the phrase "full and fair value of the property" when applied separately to improvements on publicly owned land. The *Duwamish* court held that the reversion of the improvement to the public at the end of the lease term "is a factor which must be considered in determining the subject building's assessable value." 102 Wn.2d at 256. The court further stated:

To disregard the fact that this building reverts to the Port at the end of the lease term, long before its useful life is up,

the extent to which the sale of a similar property actually represents the general effective market demand for property of such type, in the geographical area in which such property is located. Sales involving deed releases or similar seller-developer financing arrangements shall not be used as sales of similar property.

"(2) In addition to sales as defined in subsection (1) of this section, consideration may be given to cost, cost less depreciation, reconstruction cost less depreciation, or capitalization of income that would be derived from prudent use of the property. In the case of property of a complex nature, or being used under terms of a franchise from a public agency, or operating as a public utility, or property not having a record of sale within five years and not having a significant number of sales of similar property in the general area, the provisions of this subsection (2) shall be the dominant factors in valuation. When provisions of this subsection (2) are relied upon for establishing values the property owner shall be advised upon request of the factors used in arriving at such value.

"(3) In valuing any tract or parcel of real property, the value of the land, exclusive of structures thereon shall be determined; also the true and fair value of structures thereon, but the appraised valuation shall not exceed the true and fair value of the total property as it exists. In valuing agricultural land, growing crops shall be excluded.

"(4) In valuing any tract or parcel of real property designated and zoned under a comprehensive plan adopted under chapter 36.70A RCW as agricultural, forest, or open space land, the appraisal shall not be based on similar sales of parcels that have been converted to nonagricultural, nonforest, or nonopen-space uses within five years after the sale."

would be to disregard a factor which plainly would affect *the price negotiations between a willing buyer and a willing seller.*

*Duwamish*, 102 Wn.2d at 256 (emphasis added). Nothing in the *Duwamish* opinion, however, changed the traditional valuation *methods*. The *Duwamish* court merely recognized that, as applied to improvements on publicly owned land, RCW 84.40.030 "must be interpreted to tax only the limited interest in the improvement" rather than the entire fee. *Duwamish*, 102 Wn.2d at 255.

 Courts have consistently interpreted the words "true and fair value in money" to mean "fair market value." *Sahalee*, 108 Wn.2d at 29. Ordinarily, "market value" is the amount a willing buyer would pay a seller who is willing but not obligated to sell. *Duwamish*, 102 Wn.2d at 254. Appraisers generally determine fair market value by employing one or more of three general methods: market data, cost, and income capitalization. *Sahalee*, 108 Wn.2d at 33 (citing RCW 84.40.030(1) and (2)).

The market data approach involves an analysis of the sales prices of similar property. Of the three valuation methods, it is the most reliable if adequate data is available. *Sahalee*, 108 Wn.2d at 33; RCW 84.40.030(1). The cost method can take the form of cost less depreciation or reconstruction cost less depreciation. Under this method, the appraiser estimates what it would cost a typically informed purchaser to produce a replica of the property in its present condition. Typically, an estimate of the depreciated reproduction cost of the property's improvement is added to an estimated value of the land. *Sahalee*, 108 Wn.2d at 33; RCW 84.40.030(2).

Under the income capitalization method, value is assumed to be approximately equal to the present value of the future benefits of property ownership. *Sahalee*, 108 Wn.2d at 33. But this method is inappropriate when the subject property is not designed as a profit-making venture. *Sahalee*, 108 Wn.2d at 35. The appraiser's final step is to reconcile the values determined through these three

methods. The appraiser's final value places the greatest emphasis on the value generated by the method deemed to be the most reliable. *Sahalee*, 108 Wn.2d at 33-34.

■ ■ Generally, assessors are "afforded considerable discretion" in their choice of the proper valuation method. *Sahalee*, 108 Wn.2d at 36 (citing *Folsom v. County of Spokane*, 106 Wn.2d 760, 769, 725 P.2d 987 (1986)). But RCW 84.40.030(2) limits this discretion in certain circumstances. It provides that some form of cost method *or* income capitalization[4] method "shall be the dominant factors in valuation" of real property that:

(a) is of a complex nature;

(b) is being used under terms of a franchise from a public agency;

(c) is operating as a public utility; or

(d) does not have a record of sale within five years and there has not been a significant number of sales of similar property in the general area.

RCW 84.40.030(2). In this case, the Owners argue that (b) is applicable.[5] Thus, a critical question here is whether the condominium properties are being "used under terms of a franchise from a public agency."

■ Preliminarily, the County argues that the second paragraph of RCW 84.40.030, including subsections (1) and (2), applies only to real property and thus is not applicable because the property here is personal. *See* RCW 84.04.080 (for taxation purposes, all improvements upon land, the fee of which is vested in the United States is "personal property"). But RCW 84.40.040 provides that "the assessor may list and *value* improvements on publicly owned land *in the same manner as real property is* listed and *valued.*" Thus,

---

[4] Neither party has argued that the "income" approach is appropriate here.

[5] The Owners presented no evidence or argument showing that the condominiums are "of a complex nature," so we do not address that subsection of the statute.

the methods of evaluating *real* property codified in RCW 84.40.030 are also applicable to the Owners' *personal* property interest in their condominiums.

Turning to RCW 84.04.030(2), the Owners rely upon *MAC Amusement Co. v. Department of Revenue*, 95 Wn.2d 963, 633 P.2d 68 (1981), to support their argument that this is property "being used under the terms of a franchise." The issue in *Mac Amusement* was whether all the rent that MAC Amusement paid for its Fun Forest facility at the Seattle Center was subject to RCW 82.29A.030's leasehold excise tax when a portion of the rent was attributable to "good location" and "exclusivity rights."[6] 95 Wn.2d at 965. The statute at issue in *MAC Amusement*, RCW 82.29A.020(2)(a), excluded from "contract rent" "payment for concession or other rights."

MAC Amusement's lease with Seattle Center gave MAC the exclusive right to operate rides and games at the Center and to sell food within the Fun Forest location within the Center. *MAC Amusement*, 95 Wn.2d at 965. Although the *MAC Amusement* court agreed that the rent attributable to the exclusivity rights granted in the lease was excluded from taxation under the statute, it concluded that the portion of rent attributable to a favorable *location* within the Center was inseparable from the leasehold and was taxable. 95 Wn.2d at 968.

■■■ In its discussion of exclusivity rights, the *MAC Amusement* court stated: "In contrast to a leasehold, a monopoly right when conferred by a municipality is generally considered to be a franchise." 95 Wn.2d at 969. The court defined franchise as "[t]he right granted by the state or a municipality to an existing corporation or to an individual to do certain things which a corporation or individual otherwise cannot do . . . ." *Mac Amusement*, 95 Wn.2d

---

[6]RCW 82.29A.020(2)(a) provides in pertinent part: "Where the consideration conveyed for the leasehold interest is made in combination with payment for concession or other rights granted by the lessor, only that portion of such payment which represents consideration for the leasehold interest shall be part of contract rent."

at 969 (quoting EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 1740 (2d ed. 1943)).

*MAC Amusement* is not directly on point. But analogizing to its reasoning, the value of the Owners' condominiums related to "location" is not value attributable to a franchise and thus is taxable. Nothing in *MAC Amusement* supports the Owners' position that the favorable location of their condominiums is a franchise right granted by the United States Forest Service.

In contrast to the facts in *MAC Amusement*, the Owners here do not have a legally enforceable monopoly right granted by a public agency to limit the construction of additional condominiums near the ski lift. *See* RCW 84.40-.030(2). Rather, they are merely the beneficiaries of a Forest Service policy to disallow further development on Forest Service land. We decline to expand the meaning of the word "franchise" to include these circumstances where the government, by its own discretionary choice, has chosen to limit the number of permits in the area.

Thus, the limitation in RCW 84.40.030(2) did not apply here, and the trial court erred in ordering the assessor to value the Owners' property based solely on reconstruction cost less depreciation.

## II

The County also challenges the form of the judgment, describing it as a grant of equitable relief. In particular, the County contends that the trial court should have determined the amount of the refund owing to each Owner instead of ordering the County to make the calculations. The County contends that an action for equitable relief was not ripe because the taxpayers did not first bring a court action under RCW 84.68 or a claim under RCW 84.69.[7] Further, the County asserts that the Owners did not demonstrate that their legal remedies were inadequate.

---

[7]To obtain a tax refund under RCW 84.69, the Owners must file a claim with the county treasurer stating the statutory grounds upon which they claim the

The Owners contend that the statutory interpretation issues in this case are beyond the jurisdiction of administrative appeals under RCW 84.69. The Owners also contend that in a court action for a refund under RCW 84.68, the court must necessarily grant equitable relief if it determines that the assessor used an incorrect valuation methodology.

RCW 84.68 prohibits a taxpayer from seeking an injunction or restraining order *to prevent the collection* of any tax or any part thereof, except in certain defined circumstances. RCW 84.68.010. Thus, if a taxpayer believes that a tax assessment is unlawful or excessive, the taxpayer's exclusive remedy is to pay the tax "under written protest setting forth all of the grounds upon which such tax is claimed to be unlawful or excessive." Then the taxpayer may bring an action in superior court to recover any tax paid under protest. RCW 84.68.020.

■ Here, the Owners paid their assessed taxes under protest. But their complaint to superior court asked for more than a refund. They also asked for an order "compelling Pierce County to reduce the assessed value of the improvements to $58 per square foot for the 1993 tax year and for all prior tax years which are within the period of limitations," and "indicating that the personal property value in the future be determined as 50% of the comparable sales price (of improvements plus *leaseholds*) as it exists in the most recent tax years unless cost of replacement analyses support a different percentage."

Because we are reversing the summary judgment in favor of the Owners, it is not necessary that we review the form of the summary judgment that the trial court used. Further, it is unclear whether the County is objecting only to the court's order that the County perform the calculations necessary to give a refund or whether it is arguing that the trial court should not have decided the issue regarding the County's allegedly defective assessment process.

refund. RCW 84.69.030. Here, they do not have a statutory grounds for a refund under RCW 84.69.020 unless the assessed valuation is first adjudicated to be unlawful or excessive. *See* RCW 84.69.020(12).

We agree with the former proposition. The purpose of the court hearing is to determine a specific judgment amount, which amount the trial court should set forth in its judgment order. But notwithstanding *Tyler Pipe Indus., Inc. v. Department of Revenue*, 96 Wn.2d 785, 638 P.2d 1213 (1982), cited as dispositive by the County, the issue of the County's assessment process was integral to its determination of the Owners' right to a refund.

In *Tyler*, the taxpayer did not prepay the tax assessment under protest and then litigate his claim for a refund. Instead, the taxpayer brought a "Complaint for Declaration of Invalidity of Tax Assessment, Injunction and Other Relief." 96 Wn.2d at 787. The *Tyler* court found that the taxpayer did not meet the equitable criterion necessary to obtain an injunction in a constitutional case. 96 Wn.2d at 794. The facts here are distinguishable: the Owners did prepay under protest and then litigate their claim for a refund. The trial court did not err in considering the Owners' arguments regarding proper valuation methodology.

The summary judgment is reversed and the matter is remanded for trial to determine the Owners' entitlement to a refund.

HOUGHTON, C.J., and HUNT, J., concur.