# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| AVENTIS PHARMACEUTICAL, INC., and SANOFI-AVENTIS US, LLC, | No. 50641-6-II |
| Appellants, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF REVENUE, | PUBLISHED OPINION |
| Respondent. | |

MELNICK, J. — Aventis Pharmaceuticals, Inc. (Aventis) and Sanofi-Aventis US, LLC (Sanofi) appeal from the trial court's order granting summary judgment to the Department of Revenue (DOR). They contend that the trial court erred by interpreting the preferential business and occupation (B&O) tax on warehousing and reselling prescription drugs to apply only to wholesalers that sell either to retailers or health care providers, and not to wholesalers that sell to other wholesalers. They also argue that DOR's interpretation of the tax is unconstitutional and that their buyers met the requirements of the statute.

We conclude that the prescription drug wholesaler B&O tax rate applies only to wholesalers who sell either to retailers that hold a pharmacy license or to health care providers and that the plaintiffs' buyers did not fall into either of these categories. We affirm.

FACTS

Aventis, a Delaware corporation registered to do business in Washington since 1968, closed its tax account in 2006 and transferred all its business activities and employees to Sanofi, a Delaware limited liability company registered to do business in Washington since 2005. Aventis and Sanofi both engaged in the business of purchasing, warehousing, and selling prescription drugs. Both were registered with the United States Federal Drug Enforcement Administration (DEA) and licensed as pharmacy wholesalers by the Washington State Pharmacy Quality Assurance Commission (PQAC).

Aventis sought a refund for B&O taxes it paid from January 2002 through December 2005 and Sanofi sought a refund for B&O taxes it paid from December 2006 through June 2012. Both corporations claimed that the preferential B&O tax rate of .138 percent for warehousing and reselling prescription drugs should apply to their sales rather than the general B&O tax rate of .484 percent that they had paid. Because identical issues apply to both plaintiffs, we refer to them collectively as "Sanofi" for simplicity.

After Sanofi filed its refund request, DOR issued Excise Tax Advisory 3180.2013 (ETA 3180), which laid out specific requirements sellers and buyers of prescription drugs needed to meet to claim the preferential rate. DOR determined that Sanofi met the seller requirements but that the majority of its buyers, other drug wholesalers, failed to meet the buyer requirements. Accordingly, DOR denied the majority of Sanofi's refund request.

At issue in this case are Sanofi's sales to three buyers: AmerisourceBergen Drug Corporation, McKesson Corporation, and Cardinal Health Corporation. The prescription drug tax and ETA 3180 both distinguish between sales from prescription drug wholesalers to other

wholesalers and sales from wholesalers to retailers. Accordingly, whether Sanofi's buyers were wholesalers or retailers is an important issue in this case.

All three of Sanofi's buyers had licenses issued by the DEA and PQAC as pharmaceutical wholesalers, but none held a pharmacy license. They all distributed prescription drugs to both retailers and hospitals. Two of them also filed B&O tax returns for "retailing" during the relevant period.

Sanofi appealed DOR's denial of its refund request to the superior court on grounds that its activities fell within the purview of the preferential prescription drug tax. Both parties moved for summary judgment, and the superior court granted DOR's motion. Sanofi appeals.

ANALYSIS

I.    LEGAL PRINCIPLES

We review summary judgment orders de novo, performing the same inquiry as the trial court. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006). "Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Sheehan v. Cent. Puget Sound Reg'l Transit Auth.*, 155 Wn.2d 790, 797, 123 P.3d 88 (2005).

We review questions of statutory interpretation de novo. *Jametsky v. Olsen*, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014). In interpreting statutes, our goal is to "ascertain and carry out the legislature's intent." *Jametsky*, 179 Wn.2d at 762. We give effect to the plain meaning of the statute as "derived from the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.'" *Jametsky*, 179 Wn.2d at 762 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)).

If a statute's meaning is plain on its face, we give effect to that meaning as an expression of legislative intent. *Blomstrom v. Tripp*, 189 Wn.2d 379, 390, 402 P.3d 831 (2017). However, if "after this inquiry, the statute remains ambiguous or unclear, it is appropriate to resort to canons of construction and legislative history." *Blomstrom*, 189 Wn.2d at 390. If the statute "uses plain language and defines essential terms, the statute is not ambiguous." *Regence Blueshield v. Office of the Ins. Comm'r*, 131 Wn. App. 639, 646, 128 P.3d 640 (2006). "A statute is ambiguous if 'susceptible to two or more reasonable interpretations,' but 'a statute is not ambiguous merely because different interpretations are conceivable.'" *HomeStreet Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 452, 210 P.3d 297 (2009) (quoting *State v. Hahn*, 83 Wn. App. 825, 831, 924 P.2d 392 (1996)).

"Any doubts as to the meaning of a statute under which a tax is sought to be imposed will be 'construed against the taxing power.'"[1] *Weyerhaeuser Co. v. Dep't of Revenue*, 106 Wn.2d 557, 566, 723 P.2d 1141 (1986) (quoting *Duwamish Warehouse Co. v. Hoppe*, 102 Wn.2d 249, 254, 684 P.2d 703 (1984)).

II.    STATUTORY REQUIREMENTS

Sanofi contends that its sales to wholesalers qualify its activities as "warehousing and reselling drugs for human use pursuant to a prescription" under the prescription drug tax, RCW 82.04.272. It claims that the statute includes sales from wholesaler to wholesaler so long as the

---

[1] DOR contends that we should interpret the prescription drug tax strictly against the taxpayer, as a preferential rate is equivalent to an exemption or deduction. *See N. Cent. Wash. Respiratory Care Servs., Inc. v. Dep't of Revenue*, 165 Wn. App. 616, 625, 268 P.3d 972 (2011). However, *Agrilink Foods, Inc. v. Department of Revenue*, 153 Wn.2d 392, 396-97, 103 P.3d 1226 (2005) (quoting *Ski Acres, Inc. v. Kittitas County*, 118 Wn.2d 852, 857, 827 P.2d 1000 (1992)), held that, in the context of a preferential tax rate for a specific industry, "'[i]f any doubt exists as to the meaning of a taxation statute, the statute must be construed most strongly against the taxing power and in favor of the taxpayer.'" Because the prescription drug tax statute involves a preferential rate and not an exemption or deduction, we construe it against DOR.

chain of sales culminates in a sale to a person selling at retail or to a health care provider. We disagree.

A.   STATUTORY LANGUAGE

Sanofi maintains that sales of drugs between wholesalers meet the statutory requirements for the preferential rate as long as the chain of sales culminates in a sale to a retailer or health care provider. It contends that the prescription drug tax expressly contemplates these sales by including buying of drugs "from a manufacturer or another wholesaler." We disagree.

RCW 82.04.272(1) provides: "Upon every person engaging within this state in the business of warehousing and reselling drugs for human use pursuant to a prescription; as to such persons, the amount of the tax shall be equal to the gross income of the business multiplied by the rate of 0.138 percent."

The statute defines "[w]arehousing and reselling drugs for human use pursuant to a prescription" to mean:

> [T]he buying of drugs for human use pursuant to a prescription from a manufacturer or another wholesaler, and reselling of the drugs to persons selling at retail[2] or to hospitals, clinics, health care providers, or other providers of health care services,[3] by a wholesaler or retailer who is registered with the federal drug enforcement administration and licensed by the pharmacy quality assurance commission.

RCW 82.04.272(2)(b).   The prescription drug tax rate is a preferential rate to the general wholesaler tax rate of 0.484 percent. RCW 82.04.270.

---

[2] The B&O tax section defines "sale at retail" to mean "every sale of tangible personal property . . . to all persons irrespective of the nature of their business" excluding "[p]urchases for the purpose of resale as tangible personal property in the regular course of business without intervening use by such person." RCW 82.04.050(1)(a).

[3] We use "health care providers" as shorthand for "hospitals, clinics, health care providers, or other providers of health care services" throughout this opinion.

Per the statutory definition, to obtain the preferential rate Sanofi must (1) buy drugs for human use pursuant to a prescription, (2) from a manufacturer or another wholesaler, (3) resell to persons selling at retail or to health care providers,[4] (4) be a wholesaler or retailer, (5) be registered with the DEA, and (6) be licensed by the PQAC. RCW 82.04.272(2)(b). The only requirement at issue in this case is number three: whether the statute required Sanofi to have sold to persons selling at retail or health care providers and, if so, whether it did so.

We interpret statutes so as to give effect to all the language used without rendering any portion meaningless or superfluous. *G-P Gypsum Corp. v. Dep't of Revenue*, 169 Wn.2d 304, 309, 237 P.3d 256 (2010). We do not simply ignore express statutory terms. *Ralph v. Dep't of Nat. Res.*, 182 Wn.2d 242, 248, 343 P.3d 342 (2014). We read statutes so as to not render any portion superfluous. *Stroh Brewery Co. v. Dep't of Revenue*, 104 Wn. App. 235, 239-40, 15 P.3d 692 (2001).

The prescription drug tax at issue in this case defines warehousing and reselling of prescription drugs as the "buying of drugs . . . from a manufacturer or another wholesaler, and reselling of the drugs to persons selling at retail or to [health care providers], by a wholesaler or retailer" who is registered with the DEA and licensed by the PQAC. RCW 82.04.272(2)(b). It then applies a preferential rate to persons engaging in the business of warehousing and reselling prescription drugs. RCW 82.04.272(1). Sanofi's proposed interpretation of the statute would omit from the definition the requirement that the drugs be resold "to persons selling at retail or [to health care providers]."

---

[4] We note that a potential ambiguity exists in the statute as to whether it requires Sanofi to sell to either (1) persons selling at retail or (2) to health care providers, or whether it requires Sanofi to sell to persons selling (1) at retail or (2) to health care providers. Both parties agree that the first interpretation is the proper reading of the statute, and so do we.

Sanofi's claim that the chain of sale must merely culminate in a sale to a retailer or health care provider is unpersuasive. The majority of drugs sold "for human use pursuant to a prescription" will ultimately be the subject of a retail sale. We do not interpret statutes to contain meaningless or superfluous language. *G-P Gypsum Corp*, 169 Wn.2d at 309.

Sanofi additionally argues that the prescription drug tax applies to "persons" rather than transactions such that Sanofi, as a "person" engaged in the warehousing and reselling of prescription drugs, should benefit from the preferential rate regardless of the status of individual transactions it makes. This argument reads the entire definition of "warehousing and reselling" of prescription drugs out of the statute and we do not find it persuasive. Although the tax states that it applies to "persons" engaged in the business of "warehousing and reselling drugs for human use pursuant to a prescription," the meaning of that defined term is precisely the issue the parties dispute in this case. Focusing on "person" does not change the analysis of this term.

B.      ETA 3180

DOR adopted ETA 3180, an excise tax advisory specifying particular requirements for both the seller and buyer in a given prescription drug transaction for the preferential rate to apply. Sanofi argues that ETA 3180 is invalid because it adds a new requirement to the statute that qualified buyers must have a pharmacy license.

DOR contends that we should apply the requirements it laid out in ETA 3180. DOR claims that, under ETA 3180, Sanofi's buyers must hold a pharmacy license from the Department of Health in order for Sanofi to qualify for the preferential rate. We agree with DOR.

Excise tax advisories are interpretive statements authorized by RCW 34.05.230. DOR has authority to adopt interpretive regulations; however, they are not binding on reviewing courts. *Ass'n of Wash. Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 445, 447, 120 P.3d 46 (2005). Unlike

legislative rules, interpretive rules "are afforded no deference other than the power of persuasion." *Ass'n of Wash. Bus.*, 155 Wn.2d at 447. "[I]nterpretive rules are not binding on the public. They serve merely as advance notice of the agency's position should a dispute arise and the matter result in litigation." *Ass'n of Wash. Bus.*, 155 Wn.2d at 447. "If the public violates an interpretive rule that accurately reflects the underlying statute, the public may be sanctioned and punished, not by authority of the rule, but *by authority of the statute*." *Ass'n of Wash. Bus.*, 155 Wn.2d at 447.

In order for a seller to qualify for the preferential rate under ETA 3180, it must (1) purchase prescription drugs from a manufacturer or wholesaler; (2) warehouse and resell the prescription drugs; (3) be registered with the DEA; and (4) be licensed by the PQAC (as either a wholesaler or a retailer). The buyer of the drugs must be either (1) a retailer with a pharmacy facility license or non-residential pharmacy license issued by the Department of Health or (2) a hospital, clinic, health care provider, or other provider of health care services.

We consider whether ETA 3180's buyer requirements explain the prescription drug tax or add additional requirements not present in the statute. We conclude ETA 3180's buyer requirements are explanatory and that Sanofi has not met them because none of its buyers held a pharmacy license.

It is unlawful to "practice pharmacy" in Washington without a pharmacy license. RCW 18.64.020. The "practice of pharmacy" includes "compounding, dispensing, labeling, administering, and distributing" prescription drugs. RCW 18.64.011(28). Persons licensed as prescription drug manufacturers or wholesalers may "practice pharmacy" to the extent they act within the scope of their licenses. RCW 18.64.020.

Wholesale prescription drug distribution is defined by regulation as distribution of drugs to persons "other than a consumer or patient" and expressly does not include drug sales "pursuant

to a prescription." WAC 246-879-010(10). A wholesale license allows distributors to sell to licensed pharmacies and to "other legally licensed or authorized person[s]." WAC 246-879-010(1). Regulations do not clarify who other legally licensed or authorized persons might be.

Although pharmaceutical regulations do not use the term "retail sale," general tax statutes define "sale at retail" as "every sale of tangible personal property" except, as relevant here, "for the purpose of resale . . . in the regular course of business without intervening use." RCW 82.04.050(1)(a).

Reading these statutes and regulations together, a legal retail sale of drugs without a pharmacy license requires a holder of a wholesaler license to sell to a "legally licensed or authorized person" "other than a consumer or patient" and the sale must not be for purpose of resale in the regular course of business. The only sales that could fall into this narrow category are sales to healthcare providers.[5] Any retail sale of prescription drugs that is neither to a health care provider, nor made by a holder of a pharmacy license, would be unlawful pursuant to RCW 18.64.020. Accordingly, ETA 3180 does not add additional requirements to RCW 82.04.272; it merely explains what is necessarily required.

We conclude that ETA 3180 is explanatory, persuasive, and consistent with applicable statutes and rules. We choose to apply it in this case. Because none of Sanofi's buyers held pharmacy licenses or were health care providers, Sanofi may not claim the preferential rate offered by the prescription drug tax.

---

[5] We discuss the status of sales to health care providers below, where we consider whether Sanofi's buyers' sales to hospitals were "retail" sales.

C.    STATUTORY CONTEXT

Sanofi contends that other similar B&O tax statutes support its interpretation.  Specifically, Sanofi points to the B&O taxes for manufacturing and selling commercial airplanes and airplane parts, perishable meat products, and newspapers, claiming they all create single classes, encompassing wholesale and retail sales, "as a single, taxable class of activity."[6]  Reply Br. of Appellant at 8.

In deriving the plain meaning of the statute, we look to "the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.'" *Jametsky*, 179 Wn.2d at 762 (quoting *Campbell & Gwinn, LLC*, 146 Wn.2d at 11).

RCW 82.04.260[7] provided various B&O tax rates for numerous specific businesses in Washington.  For example, RCW 82.04.260(11) set the B&O tax rate for Washington persons "in the business of manufacturing commercial airplanes, or components of such airplanes, or making sales, at retail or wholesale, of commercial airplanes or components of such airplanes, manufactured by the seller."  RCW 82.04.260(4) provided the B&O tax rate for those "in the business of slaughtering, breaking and/or processing perishable meat products and/or selling the same at wholesale only and not at retail."  RCW 82.04.260(12)(c) set a B&O tax rate for persons "in the business of selling at wholesale" various types of timber products.

---

[6] Sanofi first raises this argument in its reply brief.  Generally, we do "not consider arguments raised for the first time in a reply brief." *Kittitas County v. Allphin*, 190 Wn.2d 691, 707 n.10, 416 P.3d 1232, (2018).  However, we choose to address these arguments because they are interwoven with Sanofi's other arguments.

[7] The legislature has amended RCW 82.04.260 since the time period relevant to this case. *See, e.g.*, LAWS OF 2018, ch. 164 § 3.  Our analysis is not changed by any of the amendments.  We cite to the current version of the statute.

A survey of these various B&O tax schemes shows that the legislature frequently words different B&O tax statutes differently for different types of businesses, intending different interpretations. In the commercial airplane business, it specifically applies the special rate to both wholesalers and retailers, whereas in the perishable meat product business, it specifically applies the special rate to only wholesalers and not retailers. As to timber, it applies the special rate to wholesalers and does not mention retail.

Given the many different examples of B&O tax schemes the legislature has created, no specific one helps us to understand the meaning of the prescription drug tax. The commercial airplane statute is clear that retail sales are to be included, while the perishable meat products statute is clear that they are not.

The prescription drug tax clearly applies only to wholesalers, but the parties dispute whether it applies to all wholesalers or only to a subset that sell to retailers and health care providers. Contrary to Sanofi's characterization, the other B&O tax schemes do not treat all participants in each business as a "single, taxable class." Reply Br. of Appellant at 8. Rather, the other statutes make a number of policy-based distinctions between types of sales in various industries. The other B&O tax statutes cited by Sanofi do not help to interpret the prescription drug tax. We apply the statute's plain meaning, as discussed above.

The plain meaning of the prescription drug tax unambiguously requires buyers to be either retail sellers or health care providers. Accordingly, we do not consider the statute's legislative history.

III.   CONSTITUTIONAL ARGUMENTS

A.   DUE PROCESS

Sanofi next contends that an interpretation that makes its tax liability contingent on subsequent transfers outside its control, such as sales made by its customers, would violate the due process clauses of the United States and Washington Constitutions.  We disagree.

DOR contends that Sanofi raises its due process arguments for the first time on appeal and does not amount to a claim of manifest error affecting a constitutional right.

RAP 2.5(a) states that we "may refuse to review any claim of error which was not raised in the trial court."   However, this rule "allows an appellant to raise for the first time a 'manifest error affecting a constitutional right.'"  *State v. Lazcano*, 188 Wn. App. 338, 356, 354 P.3d 233 (2015) (quoting RAP 2.5(a)(3)).  An error "is manifest if either it results in actual prejudice, . . . or the party makes a plausible showing that the error had practical and identifiable consequences to the trial."  *In re Det. of Monroe*, 198 Wn. App. 196, 201, 392 P.3d 1088 (2017).  This provision permits constitutional issues to be raised for the first time on appeal, provided the record is adequate to permit review.  *In re Marriage of Akon*, 160 Wn. App. 48, 59, 248 P.3d 94 (2011).  In order to make a determination if the claim constitutes manifest constitutional error, we must review the merits of the claim.

Sanofi contends that it is unconstitutional for DOR to make its tax liability contingent on actions of those over whom it has no control, i.e. its buyers.  It relies principally on *Dot Foods, Inc. v. Department of Revenue*.  166 Wn.2d 912, 215 P.3d 185 (2009).  We disagree.

In *Dot Foods*, Dot was exempt from paying Washington B&O tax as an out-of-state corporation making all sales to or through its direct seller's representative.  166 Wn.2d at 916-17.  DOR then issued a regulation interpreting the exemption Dot had relied upon, requiring that out-

of-state sellers "could never sell any consumer products that anyone will eventually sell in a permanent retail establishment anywhere in the chain of distribution." *Dot Foods*, 166 Wn.2d at 917. Because grocery stores and other retail establishments ultimately sold some of Dot's products, DOR assessed B&O tax against Dot. *Dot Foods*, 166 Wn.2d at 917. Dot argued that it had no control over the downstream sales of its products, so its tax-exempt status should not be contingent on the actions of its purchasers. *Dot Foods*, 166 Wn.2d at 922-23.

The court ruled that "[t]he tax or tax exemption under the terms of the statute focuses on the seller's transaction with the seller's product, not on what some purchaser opts to do with the product after the transaction with Dot is completed." *Dot Foods*, 166 Wn.2d at 923. Contrary to Sanofi's characterization of *Dot Foods*, the Supreme Court's based its reasoning on statutory interpretation, not the due process clause. 166 Wn.2d at 923-25. Although the court expressed its agreement with an amicus brief that made constitutional arguments, it phrased its holding as: "the express language of [the statute] does not require downstream sales to be restricted from permanent retail establishments." *Dot Foods*, 166 Wn.2d at 924, 926.

In *Stroh Brewery*, the company produced alcoholic beverages out-of-state, and sold them to Washington distributors. 104 Wn. App. at 237. Stroh claimed, like Dot, that it qualified for a tax exemption as an out-of-state business that sold only to or through a direct seller's representative. *Stroh Brewery*, 104 Wn. App. at 237-38. The statute at issue required that for Stroh to qualify for the exemption, neither Stroh's representative "'[n]or any other person'" sell Stroh's products in a permanent retail establishment. *Stroh Brewery*, 104 Wn. App. at 238 (quoting RCW 82.04.423(2)).

Stroh argued that the statute only prohibited its representative from selling in its own retail establishment because it could not be expected to track each product unit and ensure it is *never*

sold in *any* retail establishment. *Stroh Brewery*, 104 Wn. App. at 241. The court ruled, however, that this interpretation would render the phrase "or any other person" superfluous and denied Stroh the tax exemption. *Stroh Brewery*, 104 Wn. App. at 241.

In *Dot Foods*, DOR argued that *Stroh Brewery* should control because, like in that case, permitting the tax exemption despite "downstream" retail sales would ignore statutory language prohibiting "any other person" from selling in a permanent retail establishment. 166 Wn.2d at 924-25. Rather than invalidating *Stroh Brewery*, the court distinguished it on the basis that Stroh had made wholesale sales "to" its representative, who had then resold the goods, while Dot had made retail sales "through" its representative directly to distributors. *Dot Foods*, 166 Wn.2d at 925-26.

Both *Dot Foods* and *Stroh Brewery* addressed the direct seller's representative tax exemption and came out opposite ways, distinguished by whether the business made retail or wholesale sales into Washington. This case concerns a different statute that distinguishes between drug sales to wholesalers and sales to retailers. Neither *Dot Foods* nor *Stroh Brewery* suggests that such a distinction violates the due process clause of the constitution.

Sanofi fails to show a manifest error affecting a constitutional right and cannot raise this argument for the first time on appeal.

14

B.        EQUAL PROTECTION AND PRIVILEGES AND IMMUNITIES CLAUSES

Sanofi contends that DOR's interpretation of the prescription drug tax would violate the equal protection clause of the constitution.[8]  It argues that the prescription drug tax and ETA 3180 create a single class of taxpayers in the business of warehousing and reselling prescription drugs and that DOR's interpretation creates an unconstitutional differential treatment of individuals within that class.[9]  Sanofi relies primarily on *Associated Grocers, Inc. v. State*, 114 Wn.2d 182, 787 P.2d 22 (1990).

The equal protection clause mandates that "'all persons similarly situated should be treated alike.'"  *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 608, 192 P.3d 306 (2008) (quoting *O'Hartigan v. Dep't of Pers.*, 118 Wn.2d 111, 121, 821 P.2d 44 (1991)).  "[T]he right to equal protection guaranteed under the Fourteenth Amendment and by the privileges and immunities clause of the Washington Constitution are 'substantially identical and considered by this court as one issue.'"  *State v. Lewis*, 194 Wn. App. 709, 715-16, 379 P.3d 129 (quoting *State v. Smith*, 117 Wn.2d 263, 281, 814 P.2d 652 (1991)), *review denied*, 186 Wn.2d 1025 (2016).  The appropriate level of scrutiny under the equal protection clause "depends on the nature of the classification or rights involved."  *Am. Legion Post. #149*, 164 Wn.2d at 608.  In this case, the

---

[8] Sanofi does not specify whether it means the United States or Washington Constitution. However, the primary case it relies on, *Associated Grocers, Inc. v. State*, discusses the equal protection clause of the United States Constitution and the privileges and immunities clause of the Washington Constitution.  114 Wn.2d 182, 188, 787 P.2d 22 (1990).

[9] DOR contends that we should not consider this argument because Sanofi raised it for the first time in its summary judgment briefing.  In summary judgment proceedings, "it is incumbent upon the moving party to determine what issues are susceptible to resolution by summary judgment, and to clearly state in its opening papers those issues upon which summary judgment is sought."  *White v. Kent Med. Ctr., Inc.*, 61 Wn. App. 163, 169, 810 P.2d 4 (1991).  Here, Sanofi raised its equal protection claim in its summary judgment memorandum of law and we consider the argument on the merits.

parties agree that rational basis is the correct level of scrutiny. We agree that rational basis is the appropriate standard.

"The rational basis test is the 'most relaxed form of judicial scrutiny.'" *Dot Foods, Inc. v. Dep't of Revenue*, 185 Wn.2d 239, 249, 372 P.3d 747 (2016) (quoting *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 223, 143 P.3d 571 (2006)). Further, the legislature has "very broad discretion in establishing classifications for economic and social legislation" and this discretion is "even broader" when "making classifications for purposes of taxation." *Forbes v. City of Seattle*, 113 Wn.2d 929, 944, 785 P.2d 431 (1990).

In *Associated Grocers*, a grocery wholesaler sold merchandise to independently owned grocery retailers. 114 Wn.2d at 184-85. It competed with another grocery business that owned the entire chain of distribution, such that it "perform[ed] wholesaling functions" but without making any wholesale sales. *Associated Grocers*, 114 Wn.2d at 185. The applicable B&O tax applied to both wholesale grocery sales and also to "distributors" "who perform functions equivalent to wholesaling functions" so as to capture both types of businesses. *Associated Grocers*, 114 Wn.2d at 185. The tax contained an exemption for "distributors" who distributed merchandise on which the tax had already been paid, but contained no equivalent exemption for wholesalers in the same situation. *Associated Grocers*, 114 Wn.2d at 185. Associated Grocers challenged the B&O tax, claiming the tax scheme denied it equal protection under the laws by arbitrarily treating it differently from its vertically-integrated competition. *Associated Grocers*, 114 Wn.2d at 185.

To determine whether the tax exemption violated equal protection, the court applied "minimal scrutiny" or the "rational basis" test to make three inquiries: "(1) whether the classification applies alike to all members within the designated class; (2) whether some basis in

reality exists for reasonably distinguishing between those within and without the class; and, (3) whether the challenged classification bears any rational relation to the purposes of the challenged statute." *Associated Grocers*, 114 Wn.2d at 187. The court determined that distributors and wholesalers were within the same "class," which caused the statute to fail the first part of the test because members of the class were treated differently. *Associated Grocers*, 114 Wn.2d at 187-88. Accordingly, it concluded the exemption was unconstitutional without reaching the latter two inquiries of the test.[10] *Associated Grocers*, 114 Wn.2d at 188.

This case is distinguishable from *Associated Grocers* because the prescription drug tax does not create a single "class" and treat its members differently. The statute in *Associated Grocers* was titled "[t]ax on wholesalers, distributors," different subsections laid out identical tax schemes for wholesalers and distributors, and the statute stated that its intent was to "assure that the tax [was] identical for both subclasses within the class." 114 Wn.2d at 187.

The prescription drug tax imposes a "[t]ax on warehousing and reselling prescription drugs" and it creates a class of persons "engaging within this state in the business of warehousing and reselling drugs for human use pursuant to a prescription." RCW 82.04.272(1). This class does not include persons that do not engage in this business as defined by RCW 82.04.272(2)(b). As discussed above, prescription drug wholesalers who sell to other wholesalers do not meet this definition. Accordingly, they are not members of any class created by RCW 82.04.272 and are taxed as general wholesalers under RCW 82.04.270. *Associated Grocers* does not control the present case because RCW 82.04.272 does not create a single class and differentiate between its

---

[10] Sanofi contends that, like the statute in *Associated Grocers*, the prescription drug tax fails the first prong of the test. Sanofi does not argue the other two prongs of the test so we do not reach them.

members. Therefore, the prescription drug tax does not violate the equal protection or privileges and immunities clause.

IV. SANOFI'S BUYERS

Sanofi contends that, even if we adopt DOR's interpretation of the prescription drug tax relating to buyer requirements, its buyers meet those requirements. It contends that its three buyers sold prescription drugs "at retail," to health care providers. Because hospitals use drugs in the treatment of patients without reselling them, Sanofi claims they are "retail" purchasers. Accordingly, Sanofi claims that the prescription drug tax applies to it because it sold drugs to retailers.

"Sale at retail" and "sale at wholesale" are defined terms in Washington's B&O tax scheme. "Sale at retail" means "every sale of tangible personal property . . . to all persons irrespective of the nature of their business . . . other than a sale to a person who: (i) Purchases for the purpose of resale as tangible personal property in the regular course of business without intervening use by such person." RCW 82.04.050(1)(a). "Sale at wholesale" means "[a]ny sale, which is not a sale at retail." RCW 82.04.060(1).

DOR regulations specifically designate that retailing B&O tax and retail sales tax do not apply to charges to patients "for tangible personal property used in providing medical services to the patient, even if separately billed." WAC 458-20-168(7)(a). Charges for "drugs physically administered by the hospital staff" are subject to the hospital B&O tax, while charges for drugs "sold to persons or their caregivers, either for self-administration or administration by a caregiver other than the seller" are subject to retailing B&O tax and retail sales tax. WAC 458-20-168(7)(a). Regulations also specify that "[s]ales of medical products to consumers such as doctors, hospitals,

or patients are subject to retailing business and occupation (B&O) tax and the retail sales tax." WAC 458-20-18801(302).

Both parties agree that sales from Sanofi's buyers to health care providers are sometimes sales "at retail." However, DOR contends that health care providers are treated differently for the purposes of the prescription drug wholesaling B&O tax.

When interpreting statutes, "[a] general statutory provision must yield to a more specific statutory provision." *Ass'n of Wash. Spirits & Wine Distribs. v. Liquor Control Bd.*, 182 Wn.2d 342, 356, 340 P.3d 849 (2015). Additionally, we give effect to all language of a statute without rendering any portion meaningless or superfluous. *G-P Gypsum Corp.*, 169 Wn.2d at 309.

The definition of "sale at retail" and the regulations outlining the taxation scheme for sales to and by hospitals are general statements that outline the proper classification for those types of sales. RCW 82.04.272(2)(b), the specific statute at issue in this case, provides that the preferential rate applies to sales to "persons selling at retail or to hospitals, clinics, health care providers, or other providers of health care services." If all sales to health care providers are sales "at retail" under this statute, the clause providing for sales to different types of health care providers is superfluous and unnecessary.

However, as both parties state, only *some* sales to health care providers are "at retail," since many health care providers resell prescription drugs to patients. It makes sense, then, that the legislature intended the specific statute to alleviate the confusion caused by the general statutes and regulations by overriding them with a specific provision for health care providers. It spelled out that sales to retailers or to health care providers both allow wholesalers to claim the preferential rate, but sales to buyers who resell to health care providers do not.

We read the specific statute at issue in this case to override the general classifications of sales to health providers as "retail" sales and not to contain surplus language. Accordingly, Sanofi's buyers' sales to health care providers may be "retail sales" for many statutory and regulatory purposes, but the buyers are not "persons selling at retail" for purposes of RCW 82.04.272 and do not qualify Sanofi for the preferential tax rate.

## V.    CONCLUSION

Because Sanofi has not met the requirements of the prescription drug tax, the trial court did not err by granting summary judgment to DOR. We affirm its decision.

_____
                    Melnick, J.

We concur:

_____
        Bjorgen, J.

_____
        Lee, A.C.J.

20