IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| PATRICIA N. STRAND, | ) | |
| | ) | No. 37669-9-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPOKANE COUNTY AND | ) | UNPUBLISHED OPINION |
| SPOKANE COUNTY ASSESSOR, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Patricia Strand appeals the summary judgment dismissal of her

Public Records Act (PRA)[1] complaint against the Spokane County Assessor. She

accused the assessor of failing to timely and fully respond to her request for all records

showing the basis for its 2018 assessed value of her residential property.

---

[1] Chapter 42.56 RCW.

Ms. Strand apparently believes the assessor has identifiable records reflecting a process in which staff researched other properties, selected some that were comparable to hers or identified other valuation criteria, and performed arithmetic in order to arrive at the 2018 assessed value of her property. But the record demonstrates that the assessor's annual valuations are generated by a computer assisted mass appraisal process that does not rely on this sort of staff work.

The assessor has described a reasonable search and provides a plausible explanation why it has no records responsive to Ms. Strand's request other than those it has produced. Because Ms. Strand failed to present specific facts creating a genuine issue of disputed fact, we affirm.

FACTS AND PROCEDURAL BACKGROUND

In summer 2018, Patricia Strand received a notice from the Spokane County assessor of the 2018 assessed value of her and her husband, Palmer Strand's, residential property. She appealed the assessment. The assessor and the county board of equalization agreed that Ms. Strand's appeal could proceed directly to the Washington State Board of Tax Appeals (BTA).

On February 20, 2019, Ms. Strand received a scheduling letter for the valuation appeal from the BTA. That afternoon she e-mailed a public record request to the assessor, asking it to provide "the following records":

No. 37669-9-III
*Strand v. Spokane County, et al.*

> Regarding DA 18-0071 on parcel 17355.9014.[2]  I want all records that show the Assessor's basis for valuation for assessment year 2018 – 2019 taxes.
>
> The request is based on RCWs 84.40.030, 84.40.020, 84.48.150 and 42.56.520.

Clerk's Papers (CP) at 35.

Ms. Strand's PRA request was immediately acknowledged, and the next day Byron Hodgson, the county's chief deputy assessor, responded to the request by e-mail. He provided her with a 2-page property record card for parcel number 17355.9014 and stated, "Expect the second installment on or before March 8th."  CP at 729.  The computer-generated property record card, which was printed on the day it was e-mailed to Ms. Strand, included information on ownership transfers, historical valuation information, ownership and transfer of ownership information, a site description, land data and calculations, and improvement data for the parcel.

A few days later, on February 24, Ms. Strand e-mailed Mr. Hodgson a clarified request.  Her e-mail attached three property cards for parcel 17355.9014 printed on April 25, 2018.  For a "specifi[ed] date" within each of five assessment years, Ms. Strand requested data falling within three categories from which values on the "specifi[ed] date" were derived.  CP at 732-34.  Within each category, she requested between 8 and 13

---

[2] DA 18-0071 is the Spokane County Board of Equalization docket number for Ms. Strand's appeal; 17355.9014 is Spokane County's parcel number for her and Palmer Strand's property.

pieces of information, such as "sold properties" and the "arithmetic" used in arriving at values. *Id.* She emphasized that for most of the pieces of information being requested the "items . . . should clearly connect each sale to the . . . associated records." *Id.* at 733-34 (boldface omitted).

On the afternoon of March 8, Mr. Hodgson provided Ms. Strand by e-mail with a second, 19-page installment of records. The records provided included the assessor's answer to her petition appealing its 2018 assessed value.

The assessor relies on a form answer to petitions that appeal its assessed values. Among other information, the form answer explains that in order to measure the reliability of its computer assisted mass appraisal, the county has adopted the International Association of Assessing Officers' standards for ratio studies. (Ratio studies are discussed further below.) The answer identified four sales taking place between January 1, 2017, and April 30, 2018, that it explained were not necessarily comparable to her property, but that "helped establish market valuation of other properties within the statistical neighborhood in which you reside." CP at 748. It stated that "[t]he statistical measures included within this report appear to be supportive of our initial valuation position" and, "Within 21 days of the scheduled [appeal] hearing, we will be also be [sic] providing comparable properties which we feel are reflective of your property and supportive of market value." CP at 743. Mr. Hodgson provided property

record cards for three of the four properties whose sales the answer to the petition identified as helping establish market valuation.[3]

Mr. Hodgson's e-mail provided links to the county's website where Ms. Strand could find photographs for comparable sales and other additional information pertaining to her request. The e-mail informed Ms. Strand that her request remained open and to expect the next installment of responsive records on or before March 15.

Ms. Strand responded by e-mail to Mr. Hodgson within an hour of receiving his, stating that the records he provided were "[f]rankly . . . confusing and totally nonresponsive." CP at 762. She asked him to provide the records she had requested.

On March 15, Mr. Hodgson e-mailed Ms. Strand a third installment of records. The third, 581-page installment included more property records cards, neighborhood final reports, and more links to photos for comparable sales and property sold information pertaining to Ms. Strand's public records request. The e-mail informed Ms. Strand the attached information included all relevant sales information for each year, analysis used to develop values, property characteristics for sold properties, and specific dates when values were posted. Mr. Hodgson also informed Ms. Strand that her record request remained open until March 22.

---

[3] It appears that an error was made by providing two copies of property cards for the third property sold and none for the fourth. A property card for the fourth property sold was provided in the third installment of records produced. *See* CP at 912-13.

5

On the afternoon of March 22, Mr. Hodgson e-mailed to Ms. Strand a fourth, nine-page installment of records responsive to her request. He attached files from the Online Services/Parcel Data Downloads for parcels in county neighborhood 231720. He also provided links to additional information such as the assessor's website. He also summarized the records provided to Ms. Strand in response to her request.

A couple of hours later, Ms. Strand responded to Mr. Hodgson's e-mail, complaining that he had failed to "connect everything you have mailed to me" as requested by her on March 15. CP at 1361. She asked him to "[p]lease immediately connect what you have mailed to me" with her request and concluded, "[I]f you do not immediately connect the records you are producing with what I requested I shall not ask again for this to be done. We will again end up in Court for violations of RCW 42.56.520." *Id.*

The following week, Mr. Hodgson sent Ms. Strand an e-mail that itemized the records she had requested; identified, for each, what he had produced that he considered responsive; and identified the items he concluded were not an identifiable record: ProVal code sheets, the arithmetic (formula), and appraisal theory. He concluded:

> All identifiable records that you have requested have been provided. An agency is not obligated to create a new record to satisfy a records request. Even if a new record was contemplated, it would be a complicated undertaking requiring the compilation of historical data which would not yield an arithmetic formula (correlation between sold and unsold property) to derive valuation. This request is considered closed.

6

CP at 1363 (emphasis omitted).

In a reply to Mr. Hodgson's summary e-mail the following day, Ms. Strand

supported her request for what she called "ProVal code sheets" with two documents she

described as "examples":



CP at 1364, 161-63. The example on the right is referred to hereafter as the "Floor Level Designations illustration." A label added to the top of both of Ms. Strand's examples says "Received Jul/20/10 as Assessor Policy/Procedure Record." *Id.* at 162-63.

Mr. Hodgson sent his last response to Ms. Strand's record request on April 4, reiterating that he believed Ms. Strand had received a complete response. He informed her she could contact the Spokane County Public Records Office if she believed a public record had been missed, provided her with a link to the county's website, and concluded with a statement of her right to appeal a determination to withhold information. *Id.*

Ms. Strand appealed, alleging withholding. Spokane County Public Records Officer Anthony Dinaro met with Mr. Hodgson and Steven Kinn, the county's former public records officer, to review her appeal. Mr. Dinaro concluded and timely reported to Ms. Strand, that "[a]fter a thorough review" he concluded that "all identifiable public records responsive to your request have been produced." CP at 723.

Approximately a year later, Ms. Strand filed suit against the county and the assessor, alleging violations of the PRA. We refer to the defendants hereafter, collectively, as "the Assessor." The Assessor responded by moving for summary judgment the following month. The caption of its motion for summary judgment erroneously listed Ms. Strand's husband, Palmer Strand, as a plaintiff. In support of its motion for summary judgment, the Assessor attached the declarations of Mr. Dinaro and Mr. Hodgson.

Mr. Hodgson's declaration described the steps taken in searching for documents responsive to Ms. Strand's request and clarifications and the history of his communications with her. It attached and authenticated the county's production of records.

Mr. Dinaro's declaration described the steps taken in reviewing Ms. Strand's appeal of the assessor's PRA response. It attached and authenticated his correspondence with Ms. Strand. He explained that in reviewing her appeal, he satisfied himself that the county had provided an adequate and prompt response, had performed a reasonable search, and had produced all responsive records.

Ms. Strand's response to the summary judgment motion attached over 200 pages of unauthenticated documents. They included copies of records she received from Thurston County that were different from records she received from Spokane County. She identified 19 factors, referred to by her as "valuation factors," that were not applied to her property in any records produced by the county. CP at 286-94 (boldface and capitalization omitted). She gleaned her "valuation factors" from sources such as statutes, case law, and the Assessor's responses to discovery requests and hearing transcripts from prior assessment appeals dated anywhere from 2009 to 2018. Her response was largely devoted to arguing that the Assessor wrongly valued her property, made false statements, and failed to comply with Washington statutes other than the PRA. Ms. Strand also argued that because the property record cards were printed after

the Assessor received her request, they were nonresponsive. Finally, Ms. Strand's

response argued the Assessor's inclusion of her husband as a party in the caption of its

pleadings amounted to a "failure of process violating CR 4." CP at 298-99 (boldface and

capitalization omitted).

The Assessor replied, supported by a second declaration from Mr. Hodgson. The

second declaration explained that the information on property record cards is data

maintained in the ProVal software, and while the data existed prior to Ms. Strand's

request, it was only upon receipt of her request that the card was printed, in order to

provide her with the preexisting data. Mr. Hodgson testified that the "code sheet[s]"

referenced by Ms. Strand in her complaint were of unknown origin. He testified, "I

searched the Assessor's Office and databases and could not locate these documents."

CP at 1373.

When the trial court heard the Assessor's summary judgment motion, it orally

granted it, took a short recess so that an order could be prepared and presented, and

entered its written order dismissing Ms. Strand's complaint that day.

Despite the dismissal, Ms. Strand later filed a supplemental response to the

Assessor's reply memorandum in support of summary judgment, a "Motion to Dismiss

Summary Judgment," CP at 587-88, and a motion for an order requiring the Assessor to

correct the caption on its summary judgment submissions. She filed a timely motion for

reconsideration that was denied, with the trial court ruling that it found "no basis in law

nor other reason(s) to change its original ruling and order." CP at 692. The court indicated it would not consider any materials filed by Ms. Strand following its granting of summary judgment other than the reconsideration motion it was denying.

Ms. Strand appealed.

Shortly before this appeal was originally set for hearing, Ms. Strand filed a "Motion for Additional Evidence" with 63 pages of unnumbered attachments. Mot. for Addt'l Evid., *Strand v. Spokane County et al.*, No. 37669-9-III (Wash. Ct. App. Feb. 16, 2021) (available from the court). The motion alleged that in response to a record request that Ms. Strand submitted to the Assessor in October 2020, it made responsive records available in a drop box, and one of the records produced was the Floor Level Designations illustration that she had provided to Mr. Hodgson in March 2019 as an example of a ProVal code sheet. This was a document that Mr. Hodgson testified in April 2019 was of unknown origin and could not be located in a search of the Assessor's office and databases.

We continued oral argument and afforded the Assessor an opportunity to respond to the motion. Disposition of the motion was referred to this panel.

ANALYSIS

"The PRA's primary purpose is to foster governmental transparency and accountability by making public records available to Washington's citizens." *Doe v. Wash. State Patrol*, 185 Wn.2d 363, 371, 374 P.3d 63 (2016). "To be a public record

11

under RCW 42.56.010(3), information must be (1) a writing (2) related to the conduct of government or the performance of government functions that is (3) prepared, owned, used, or retained by a state or local agency." *Nissen v. Pierce County*, 183 Wn.2d 863, 879, 357 P.3d 45 (2015). The PRA does not require agencies to "'create or produce a record that is nonexistent.'" *Fisher Broad.-Seattle TV LLC v. City of Seattle*, 180 Wn.2d 515, 522, 326 P.3d 688 (2014) (quoting *Gendler v. Batiste*, 174 Wn.2d 244, 252, 274 P.3d 346 (2012)).

A public records request must be for identifiable records. RCW 42.56.080(1). A request for information does not qualify. *Belenski v. Jefferson County*, 187 Wn. App. 724, 740, 350 P.3d 689 (2015) (citing *Wood v. Lowe*, 102 Wn. App. 872, 879, 10 P.3d 494 (2000)), *rev'd in part on other grounds*, 186 Wn.2d 452, 378 P.3d 176 (2016); *Bonamy v. City of Seattle*, 92 Wn. App. 403, 410-12, 960 P.2d 447 (1998). The PRA does not require agencies to research or explain public records, but only to make those records accessible to the public. *Id.* (citing *Bonamy*, 92 Wn. App. at 409).

Some background on real property assessment is needed to inform conclusions about what records assessors are likely to possess about valuation. The records an assessor is likely to possess will differ depending on whether there is a pending appeal of a property's assessed value.

12

No. 37669-9-III
*Strand v. Spokane County, et al.*

*Annual valuation process*

RCW 84.40.020 and .030 require all real property in the state subject to taxation to be listed and assessed every year, with reference to its value on the first day of the year, and provide that "[s]uch listing and all supporting documents and records shall be open to public inspection during the regular office hours of the assessor's office." RCW 84.40.020.

The Washington State Department of Revenue (DOR) is tasked with the general supervision and control over the administration of the assessment and tax laws of the state and over county assessors in the performance of their duties relating to taxation. RCW 84.08.010(1). In its 2018 report on the 2017 performance of the property tax appraisal system in Washington, it reported that "Washington has approximately 3.08 million real property parcels," and "[d]ue to the high volume of assessments, county assessors must use mass appraisal techniques to determine assessed values." DOR, MEASURING REAL PROPERTY APPRAISAL PERFORMANCE IN WASHINGTON'S PROPERTY TAX SYSTEM 2017, at 39 (Feb. 1, 2018) (DOR 2017 Report).[4] Mass appraisal "'systematic[ally] apprais[es] groups of properties as of a given date using standardized procedures and statistical testing.'"[5]

_____

[4] Https://dor.wa.gov/sites/default/files/legacy/Docs/Reports/2017RatioReport.pdf [https://perma.cc/K77W-HKZQ].
[5] DOR, HOMEOWNER'S GUIDE TO MASS APPRAISAL 2 (July 2014) (citing ROBERT J. GLOUDEMANS, THE MASS APPRAISAL OF REAL PROPERTY 1 (1999)), https://dor.wa.gov

13

The DOR 2017 Report included its own description of the mass appraisal process:

Mass appraisal is the process of valuing a group of properties. This approach is sometimes contrasted with more familiar single-property appraisals (sometimes called fee appraisal). Fee appraisal is the process of valuing a particular property. Both are systematic approaches to establishing property value. However, they differ in scope and method of evaluation. Mass appraisal systems are designed to value many properties and are evaluated by statistical methods. Single-property appraisals are concerned with one property and are evaluated by a comparison to comparable properties.

*Id.* at II.

The DOR is specifically charged with examining the procedures used by county assessors to assess real property. RCW 84.48.075(4). It is required annually to submit to each assessor a ratio of the assessor's assessed values to market values. RCW 84.48.075(1). A ratio study measures a county's mass appraisal performance. Using property sales from a recent period, it compares those market prices with the assessed values that were established by the assessor's office. DOR 2017 Report, *supra*, at III. The closer recent actual sale prices are to an assessor's then-current assessed value, the better the assessor's performance. In 2018, for 2019 taxes, DOR reported that Spokane County's real property tax ratio was 95.1 percent. DOR, PROPERTY TAX RATIOS BY COUNTY 2018 FOR 2019 TAXES (undated), https://dor.wa.gov/sites/default/files

---

/sites/default/files/legacy/Docs/Pubs/Prop_Tax /PropTaxMassAppraisal.pdf [https://perma.cc/GW3D-FYEA].

No. 37669-9-III
*Strand v. Spokane County, et al.*

/legacy/Docs/Reports/2018CombinedIndicatedRatio.pdf [https://perma.cc/QND8-

WSLU].

In a discovery response the Assessor provided to Patricia and Palmer Strand in the

Strands' appeal of the 2009 assessed value of their property, the Assessor described its

mass appraisal process:

> Like assessors in other Washington counties, the Spokane County Assessor utilizes Computer Assisted Mass Appraisal (CAMA) in the assessment of property values. . . .
>
> For this purpose, the Assessor's office uses a computer software program known as Manatron ProVal. Spokane County does not own ProVal, but uses it under certain terms and conditions set forth in a non-exclusive license with Manatron.
>
> Pro Val features a highly productive, integrated sketch package and an extremely accurate valuation engine for calculating property values. It includes income approach, sales approach, and cost approach models to value property. It also includes models to automatically value land. It is the most widely deployed and, nationally recognized, CAMA software product. The software's internal calibration and embedded object code is proprietary and not subject to public disclosure. Thus, definitive arithmetic formulae cannot be provided. The precise internal relationship between various components of value is not visible, or accessible, by the software user.
>
> . . . .
>
> The Assessor's staff inputs various data into the ProVal data base including: (1) information from visual inspections of the property; (2) sales and other market data from sources such as the Multiple Listing Source; (3) Real Estate Excise Tax Affidavits; (4) GIS; and (5) building permit information.
>
> With input data and . . . embedded Marshall Swift cost tables, the ProVal software is able to determine the value of a Subject Property.

CP at 327-28.

15

As long as ratio studies indicate that an assessor's computer assisted mass appraisal process is performing well, it is reasonable to assume that the assessor will rely solely on that computerized process to generate annual assessed values. Only in the six-year cycle when inspection is required, *see* RCW 84.41.030(1), would one expect an assessor to have additional, staff-created records.

*Responding to a property owner's appeal of assessed value*

While ratio studies can be evidence that an assessor's mass appraisal process is performing well, an assessor cannot rely on ratio studies or mass appraisal if a property owner challenges the assessed value of her property. By statute, if the assessed value is appealed, an assessor must defend the value produced by its mass appraisal process with an individual appraisal. When adequate market data (sales prices of similar property) is available, comparable sales is the most reliable of the three recognized valuation methods (market data, cost, and income capitalization). *Crystal Chalets Ass'n v. Pierce County*, 93 Wn. App. 70, 77, 966 P.2d 424 (1998). By statute, sales of the subject property or of comparable properties within the preceding five years is the preferred evidence of true and fair value for taxation purposes. RCW 84.40.030(3)(a).

RCW 84.48.150(1) provides that when a taxpayer petitions her county board of equalization for review of a valuation dispute the assessor must, upon request:

> make available to said taxpayer a compilation of comparable sales utilized
> by the assessor in establishing such taxpayer's property valuation. If
> valuation criteria other than comparable sales were used, the assessor must

> furnish the taxpayer with such other factors and the addresses of such other property used in making the determination of value.

The valuation criteria and/or comparable sales on which the assessor intends to rely at the appeal hearing must be provided within 60 days of the taxpayer's request but at least 21 business days before the taxpayer's appearance before the board of equalization. RCW 84.48.150(2).

In *Matalone v. Hara*, BTA Docket No. 71193, 2010 WL 11187619 (Apr. 13, 2010),[6] property owners challenging the valuation of their property wanted to rely on assessed values of other properties arrived at by mass appraisal. The BTA rejected their proposed evidence, repeating an observation it had made in cases for 20 years:

> "Computer-Assisted Mass Appraisal techniques are just that, mass appraisal techniques. They are not without flaw. Certainly the value generated by any computer assisted approach should be supported *on appeal* by standard appraisal processes."

*Matalone*, 2010 WL 11187619, at *13 (some emphasis omitted) (quoting *O'Connor v. Belas*, BTA Docket No. 41609, 1992 WL 192195, at *2 (May 6, 1992)). The BTA went so far as to say that values arrived at by annual mass appraisal were irrelevant to the issue on appeal:

> [I]n *Spangenberg v. Baenen*, BTA Docket No. 5111977 (1999), this Board explained that the Assessor's mass appraisal work product is not relevant upon an appeal:

---

[6] An unrelated scrivener's error in the decision was corrected by an order of correction available at 2019 WL 5297790 (Apr. 25, 2019).

> While an understanding of the Assessor's mass appraisal techniques is
> helpful, the focus of this appeal is *whether the Assessor's methodology
> produced a reasonable value* for the property under review.
> This Board has one goal in all of its hearings: the acquisition of sufficient,
> accurate evidence to support a determination of true and fair value as
> defined by statute (RCW 84.40.030) and the Washington Administrative
> Code (WAC 458-12-301). . . .
>
> . . . Appraisal theory guides us in our determination.
>
> *Accordingly, the Assessor himself must, as he did here, defend his valuation
> based on market sales, which are independent of the mass appraisal
> techniques that produce the assessed values that the Assessor certifies to
> the assessment rolls.*

*Id.* (emphasis added) (alterations in original).

Accordingly, if a taxpayer appeals an assessed value to the county board of

equalization, assessor staff will engage at that point in an individual appraisal process.

Records in addition to those created by its computer assisted mass appraisal software can

be expected to exist.

With that background, we turn to the issues presented by the appeal: Ms. Strand's

motion for the taking of additional evidence and her assignments of error to the dismissal

of her complaint.

I.     MS. STRAND HAS NOT DEMONSTRATED THAT WE SHOULD ORDER THE TAKING OF
       NEW EVIDENCE

Under RAP 9.11, we may direct that additional evidence on the merits of a case be

taken before our decision on review if (1) additional proof of facts is needed to fairly

resolve the issues on review, (2) the additional evidence would probably change the

decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court. Only if all six conditions are met will we order the taking of new evidence. *State v. Ziegler*, 114 Wn.2d 533, 541, 789 P.2d 79 (1990).

Ms. Strand's proposed new evidence is a Floor Level Designations illustration that was produced by the Assessor in response to a record request she made in 2020, after this action was dismissed. Her 2020 request asked the Assessor to produce (among other records) "all Assessor policies and procedures (mechanisms) used to determine values." Mot. for Addt'l Evid., Attach. 1, at 2. One of what appears to be a dozen or more manuals produced in response includes the Floor Level Designations illustration as its page 27. *Id.*, Attach. 3 at 27. The manual's cover identifies its source and date as "1/1/2020, Spokane County Assessor's Office." *Id.*, Attach. 3 at 1.

Seen here, page 27 of the 2020 manual is the same Floor Level Designations illustration Ms. Strand provided to the Assessor in March 2019 as an example of what she called "ProVal code sheets." The only difference with the illustration she provided as an example was that a label on her example reads, "Received Jul/20/10 as Assessor Policy/Procedure Record." CP at 163.



It turns out that the Floor Level Designations illustration Ms. Strand provided to Mr. Hodgson in March 2019 as an example was a record the assessor's office produced to her in 2010. In February 2010, the Assessor identified to Ms. Strand 13 or more binders or manuals, collectively comprising more than 1,500 pages, as policies and procedures

responsive to one of her requests. Mr. Hodgson assisted in identifying the list of binders and manuals. On July 20, 2010, Ms. Strand traveled to the assessor's office to review the binders and manuals and marked pages she wanted copied. One page she wanted copied was the Floor Level Designations illustration.

We can infer from Ms. Strand's proposed new evidence that some version of a manual containing the Floor Level Designations illustration might have been in the Assessor's possession at the time of her February 20, 2019 records request, since the Assessor had such a manual in 2010 and 2020. But given the different scope of her February 2019 request (it did not seek manuals, policies or procedures), the mere fact that the manual and illustration were not searched for or located in Mr. Hodgson's search is not relevant to our review.

Ms. Strand does not demonstrate that additional proof of facts is needed to fairly resolve the issues on review, that additional evidence would probably change the decision being reviewed, or that it would be inequitable to decide the case solely on the evidence already taken in the trial court.[7] Her RAP 9.11 motion is denied.

---

[7] Ms. Strand argues that the 2020 production proves Mr. Hodgson committed perjury when he testified in his second declaration that her example of a "ProVal Code Sheet" was of unknown origin and was not located in his search of the Assessor's office. Mot. for Addt'l Evid. at 9. But Mr. Hodgson testified that in responding to her request he searched "all locations where responsive records could be located," including "Department shared drives: Electronic databases: Local computers: and Websites." CP at 727. He never testified that he searched all of the Assessor's policy and procedure manuals. Even if he had, his mistake about a manual that was not responsive to the February 2019 record request would be irrelevant to the issues on review.

II.　THE TRIAL COURT PROPERLY LIMITED ITS CONSIDERATION OF MS. STRAND'S SUBMISSIONS FOLLOWING DISMISSAL OF HER MOTION FOR RECONSIDERATION

Before turning to the assigned errors we remind Ms. Strand of our rules, including RAP 10.3(a)(5), which requires the statement of the case to be "[a] fair statement of the facts and procedure relevant to the issues presented for review, *without argument*." (Emphasis added.) Ms. Strand's statement of the case is almost entirely argument. It includes argument about matters that are not assigned as error and addressed in her argument section. Pro se litigants are expected to comply with the Rules of Appellate Procedure. *State Farm Mut. Auto Ins. Co. v. Avery*, 114 Wn. App. 299, 310, 57 P.3d 300 (2002).

We will forgive Ms. Strand's failure to comply with RAP 10.3(a)(5). But we will not search her statement of the case for issues other than those raised by her assignments of error and that are addressed in her argument section.

Ms. Strand's third assignment of error challenges the trial court's refusal to consider any submissions filed after summary judgment was granted other than her motion for reconsideration. We address this alleged error first.

The court's order granting summary judgment stated, "[T]his matter is dismissed with prejudice." CP at 573. The materials filed by Ms. Strand thereafter that the court refused to consider were her supplemental response to the Assessor's summary judgment

reply memorandum, a motion for an order requiring the Assessor to correct captioning on its pleadings, and a motion to dismiss the Assessor's summary judgment motion.

CR 7(a) identifies the only pleadings that are permitted, and Ms. Strand's postdismissal submissions were not permitted pleadings. CR 7(b) permits the filing of motions, which are "application[s] to the court for an order." CR 59(a) identifies a legal basis on which a plaintiff whose complaint has been dismissed with prejudice can apply for an order: it can ask that the order of dismissal be vacated. CR 60 also identifies a legal basis on which such a plaintiff can apply for an order: it can ask that a clerical mistake in a judgment or order be corrected or that it be relieved from a final judgment.

The three submissions by Ms. Strand that the court refused to consider were properly ignored either because they violated the terms of the applicable rules or because there was no order being requested for which she had a legal basis.

Her supplemental response to the Assessor's reply memorandum was not a permitted submission under CR 56, which sets a specific timeline for summary judgment procedure. *Keck v. Collins*, 181 Wn. App. 67, 83, 325 P.3d 306 (2014), *aff'd*, 184 Wn.2d 358, 357 P.3d 1080 (2015).

Her motion for an order requiring the Assessor to correct its identification of the parties on some of its submissions was unsupported by a legal basis for the order.[8] It is

---

[8] In the trial court, Ms. Strand cited *Deggs v. Asbestos Corp. Ltd.*, 186 Wn.2d 716, 719 n.1, 381 P.3d 32 (2016), but in that case there was a misspelling in the complaint, which—being controlling—needed to be corrected.

apparent that the Assessor's initial inclusion of Palmer Strand as a plaintiff was a mistake—presumably the result of the county attorney's knowledge that Palmer Strand had joined his wife in litigation with the county in the past.[9] Court rules are clear that as between the plaintiff's and the defendants' pleadings, it is the complaint that establishes the parties to the action. *See* CR 10(a)(1) ("In the complaint the title of the action shall include the names of all the parties."). After the Assessor's misidentification of the parties was pointed out, and beginning with its summary judgment reply, it identified Ms. Strand as the only plaintiff.

Ms. Strand identified no legal basis for obtaining an order "dismissing" the Assessor's summary judgment motion after it had already been granted.

The trial court properly refused to consider the three motions.

II.     SUMMARY JUDGMENT WAS PROPERLY GRANTED

Ms. Strand's first and second assignments of error raise the issue of whether summary judgment was proper. The purpose of summary judgment is to "avoid a useless trial when there is no genuine issue of any material fact." *LaPlante v. State*, 85 Wn.2d 154, 158, 531 P.2d 299 (1975). The moving party bears the burden of proving by

---

[9] *E.g.*, *Strand v. Spokane County*, No. 36538-7-III (Wash. Ct. App. Dec. 12, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/365387_unp.pdf; *Strand v. Spokane County*, No. 34722-2-III (Wash. Ct. App. Apr. 11, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/347222_unp.pdf; *Strand v. Spokane County*, No. 34190-9-III (Wash. Ct. App. Apr. 11, 2017) (unpublished), https://www.courts.wa.gov/opinions/pdf/341909_unp.pdf.

uncontroverted facts that no genuine issue of fact exists. *See Regan v. City of Seattle*,

76 Wn.2d 501, 458 P.2d 12 (1969).

Once the moving party meets its initial burden of proof, the burden then shifts to

the nonmoving party to show that a genuine issue of fact exists. *See LaPlante*, 85 Wn.2d

at 158. When a motion for summary judgment is supported by evidentiary matter, the

adverse party may not rest on mere allegations in the pleadings but must set forth specific

facts showing that there is a genuine issue for trial. *W.G. Platts, Inc. v. Platts*, 73 Wn.2d

434, 442, 438 P.2d 867 (1968). Summary judgment shall be granted if no genuine issue

of material fact exists and the moving party is entitled to judgment as a matter of law.

CR 56(c).

Appeals courts review the grant or denial of a motion for summary judgment de

novo. *Keck*, 181 Wn. App. at 78. All facts and reasonable inferences from the facts are

to be construed in the light most favorable to the nonmoving party. *Id.* at 79.

> *The Assessor provided a reasonable estimate of time, fullest assistance, and most timely possible action on Ms. Strand's request*

RCW 42.56.100 requires that an agency responding to public records requests

provide "the fullest assistance to inquirers and the most timely possible action on requests

for information." "The government agency receiving a request for public records must

respond within five business days by (1) providing the records, (2) denying the request,

25

or (3) providing a reasonable estimate of the time within which to respond to the request." *Andrews v. Wash. State Patrol*, 183 Wn. App. 644, 651, 334 P.3d 94 (2014) (citing RCW 42.56.520).

Undisputed facts establish that the Assessor promptly and adequately assisted Ms. Strand. Mr. Hodgson responded to Ms. Strand's request by e-mail one day after receiving it. In his several responses, Mr. Hodgson informed Ms. Strand whether additional installments of production were anticipated and when she could expect to see them. Despite widespread business interruption being caused by the COVID-19 pandemic, Mr. Hodgson delivered the installments as projected, delivering the fourth and final installment on March 22, a little over a month after receiving Ms. Strand's record request. No facts creating a genuine issue of material fact as to the timeliness of the Assessor's response were shown.

*The Assessor conducted an adequate search*

On summary judgment, the agency bears the burden of proving it conducted an adequate search for records. *Block v. City of Gold Bar*, 189 Wn. App. 262, 271, 355 P.3d 266 (2015). "To establish that its search was adequate in a motion for summary judgment, 'the agency may rely on reasonably detailed, nonconclusory affidavits submitted in good faith.'" *Id.* (quoting *Neigh. All. of Spokane County v. County of*

*Spokane*, 172 Wn.2d 702, 721, 261 P.3d 119 (2011)).  These affidavits "should include the search terms and the type of search performed, and they should establish that all places likely to contain responsive materials were searched."  *Neigh. All.*, 172 Wn.2d at 721.  "Purely speculative claims about the existence and discoverability of other documents will not overcome an agency affidavit, which is accorded a presumption of good faith."  *Forbes v. City of Gold Bar*, 171 Wn. App. 857, 867, 288 P.3d 384 (2012).

The declarations of Mr. Hodgson and Mr. Dinaro on which the Assessor relied were reasonably detailed and nonconclusory, as the law requires.  We accord them the presumption of good faith.

Ms. Strand argues that the Assessor's failure to produce the press releases, court transcript testimony and state auditor statements that she attaches to her opposition memorandum proves its search was inadequate.  But she does not explain how her documents, some going back almost a decade, have anything to do with her record request.  She also fails to explain how or why court transcripts and press releases would be in the Assessor's possession.  The Assessor relies on computer assisted mass appraisal to generate its annual assessed values, and court transcripts, statutes, and press releases are not inputs in that process.  As was explained to her in 2010, the inputs are things like

observed characteristics of a property, sales and other market data, real estate excise tax affidavits, geographic information system data, and building permit information—information available from the type of records that Mr. Hodgson either produced or directed her to.

The Assessor's declarations are evidence of an adequate search and Ms. Strand does not respond with facts raising a genuine issue of material fact.

*Property record cards printed after receipt of the request were responsive*

Ms. Strand contends that property record cards provided by Mr. Hodgson are nonresponsive because the cards were created after he received her record request. A record must exist at the time of a request to be subject to required disclosure. *Fisher Broad.*, 180 Wn.2d at 522. An agency is not required to create a record to respond to a PRA request. *Id.*

"Public record" is broadly defined, however, and includes "existing data compilations from which information may be obtained" "regardless of physical form or characteristics." RCW 42.56.010(4), (3). "This broad definition includes electronic information in a database." *Fisher Broad.*, 180 Wn.2d at 524 (citing RCW 42.56.010(4), (3); WAC 44-14-04001). "Merely because information is in a database designed for a

different purpose does not exempt it from disclosure. Nor does it necessarily make the production of information a 'creation' of a record." *Id.*

The Assessor likely would have violated the PRA had it failed to print out property record cards containing the preexisting information that was responsive to Ms. Strand's record request. In any event, the fact that a record did not exist when a request for records was made is a *defense* to a failure to produce it. For an agency to do a requestor the favor of creating a record or providing a later-created record is not a violation of the PRA. It is not something a typical requestor would complain about. No violation of the PRA is shown.

Ms. Strand's main argument is that none of the records produced by the Assessor is a comparable sale used to arrive at its assessed value as of January 1, 2018, or appears on its face to be other criteria used to value her property as of that date or the other dates she specified. But unless Ms. Strand made a request under RCW 84.48.150 for the information the Assessor would rely on in her future appeal hearing, and the deadline for producing that information was approaching, there is no reason to believe the Assessor would have responsive documents. For her specified dates that were unrelated to assessed value appeals, there was no reason to believe the records she was looking for existed or ever would exist.

29

Ms. Strand offered only speculation that responsive records existed that were not produced. No facts creating a genuine issue of material fact were shown. Summary judgment was proper.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Fearing, J.